IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MCALLISTER & QUINN, LLC,

     Plaintiff,

          vs.                                       Case No.

JESSICA VENABLE, SCOTT TOMINOVICH,
CHRIS FISH, JOO YOUNG LEE, CASEY
NEWELL, and JAKE PARDUHN

     Defendants.

## VERIFIED COMPLAINT

Plaintiff McAllister & Quinn, LLC ("M&Q," the "Firm," or "Plaintiff") sues Defendants

Jessica Venable ("Venable"), Scott Tominovich ("Tominovich"), Chris Fish ("Fish"), Joo Young

Lee ("Lee"), Casey Newell ("Newell"), and Jake Parduhn ("Parduhn") (collectively

"Defendants"), and alleges as follows:

## INTRODUCTION

1.     This is an action for misappropriation of trade secrets and breach of contractual

and common law duties arising from the coordinated departure of nearly one-tenth of M&Q's

workforce.  In the span of 37 minutes on the morning of January 3, 2022—just two weeks or less

after pocketing their annual bonuses from M&Q—Defendants tendered substantially identical

notices of resignation from M&Q.  Defendants also provided M&Q with termination notices

from certain M&Q's clients, which notices Defendants had concealed from M&Q since as early

as November 1, 2021.

2.     Defendants have since begun employment with a direct competitor of M&Q.  On

information and belief, in the weeks preceding Defendants' resignations, Defendants solicited

then-clients of M&Q to terminate their contracts with M&Q and to follow Defendants to M&Q's competitor.

3.      Blindsided by these departures, M&Q undertook an investigation of Defendants' use of the Firm's intellectual property.  The Firm's audit revealed that, in the weeks leading up to Defendants' departures, Defendants accessed and downloaded thousands of pages of M&Q's confidential and trade secret information—all in breach of confidentiality obligations in Defendants' employment agreements.  Several Defendants forwarded M&Q confidential information and trade secrets to their personal e-mail accounts in the days and weeks preceding their resignations.

4.      Defendants have breached and/or are breaching their employment agreements and fiduciary duties to M&Q through their coordinated departures, mass downloads of confidential and trade secret information, forwarding trade secrets and confidential information to their personal e-mail accounts, solicitation of M&Q clients, solicitation of M&Q employees, concealment of M&Q client termination notices, and providing certain services to former M&Q clients.  Defendants' misappropriation of M&Q's trade secrets further violates the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the D.C. Uniform Trade Secrets Act, D.C. Code §§ 36-401 *et seq.*

5.      M&Q's investigation is ongoing, and the full extent of Defendants' misappropriation and improper use of M&Q's trade secrets remains unknown.

**PARTIES, JURISDICTION, AND VENUE**

6.      Plaintiff M&Q is a District of Columbia limited liability company with its principal place of business located at 1030 15th Street., NW, Suite 590 West, Washington, DC 20005.

7.     Defendant Venable is a citizen of Maryland and, upon information and belief, has a residential address at 5415 Linden Court, Bethesda, Maryland, 20814.

8.     Defendant Tominovich is a citizen of Maryland, upon information and belief, and has a residential address at 16 Mayo Avenue, Annapolis, Maryland 21403.

9.     Defendant Fish is a citizen of Virginia and, upon information and belief,  has a residential address at 12690 Arthur Graves Jr. Court, Bristow, Virginia 20136.

10.    Defendant Lee is a citizen of California and, upon information and belief, has a residential address at 1916 Pelham Avenue, Unit 4, Los Angeles, California 90025.

11.    Defendant Newell is a citizen of Washington, D.C. and, upon information and belief, has a residential address at 1435 N Street, NW, Apartment 102, Washington, D.C. 20005.

12.    Defendant Parduhn is a citizen of Washington, D.C. and, upon information and belief, has a residential address at 2800 Woodley Road NW, #144, Washington, D.C. 20008.

13.    This Court may exercise federal jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on the Defend Trade Secrets Act, 18 U.S.C. § 1836, and this Court may exercise supplemental jurisdiction over the non-federal claims herein pursuant to 28 U.S.C. § 1367(a) because the non-federal claims arise out of the same facts and circumstances as the federal claim.

14.    This Court has personal jurisdiction over Defendants because the wrongful acts of Defendants occurred in this District, causing injury to M&Q in this District.  *See* D.C. Code § 13-423(a)(3).  Additionally, Defendants have contractually consented to the jurisdiction of this Court.

## BACKGROUND FACTS

15.     M&Q is a premier federal grant consulting and government relations firm that provides services, which include grant and foundation consulting, to a diverse group of clients across a number of industries throughout the United States and internationally.

16.     As of January 1, 2022, M&Q had 55 employees worldwide, including 10 Vice Presidents (including Defendants), and 1 intern.

17.     M&Q also has a substantial grant consultant network.  The grant consultants are subject matter experts and assist in proposal development and the grant writing process.

**I.      M&Q's Confidential Information and Trade Secrets**

18.     In connection with the services and consulting developed and offered by M&Q, M&Q develops and maintains sensitive, proprietary, and confidential information about its business, business plans, services, service strategies and roadmaps, finances, marketing strategies, personnel, grant consultants, and customers.  Certain of M&Q's confidential and proprietary information constitutes valuable trade secrets.

19.     M&Q's confidential, proprietary, and trade secret information gives M&Q a competitive advantage over its competitors who have not made substantial economic and other investments in developing similar information.  M&Q has invested significant time and economic resources in developing and compiling this confidential, proprietary, and trade secret information.

20.     M&Q's confidential, proprietary, and trade secret information is not generally or publicly known in its business of grant consulting and government relations services, nor is this information readily ascertainable through reverse engineering or independent development.

21.     M&Q makes efforts that are reasonable under the circumstances to maintain the secrecy of its confidential, proprietary, and trade secret information because a current or former employee's use or disclosure of M&Q's confidential and trade secret information will result in irreparable harm to M&Q.

22.     M&Q's confidential, proprietary, and trade secret information is subject to obligations embodied in, among other things, agreements between M&Q and its employees and M&Q's internal policies and procedures protecting confidential, proprietary, and trade secret information.

23.     Because M&Q employees require access to M&Q's confidential and proprietary information to perform their duties, M&Q requires, among other things, that its employees adhere to employment policies that emphasize the importance of maintaining the secrecy of M&Q and its clients' confidential and proprietary information. M&Q also requires employees to sign agreements that limit the use and disclosure of confidential and proprietary information. M&Q provided Defendants and other employees monthly privacy and security training, which emphasizes the importance of maintaining the secrecy of M&Q's confidential information and trade secrets and of adhering to client confidentiality obligations.

24.     M&Q's trade secrets relate to services the Firm provides clients across the United States and internationally.  M&Q uses its trade secrets to ensure the Firm's competitive advantage in providing services to clients in Australia, California, Texas, and Virginia, among other places.

25.     As detailed further below, Defendants have misappropriated three general categories of M&Q's trade secrets:

**A.      M&Q's Grant Proposal Methodologies**

26.      M&Q has developed confidential methodologies for preparing and developing

grant proposals ("M&Q's Grant Proposal Methodologies").  M&Q's Grant Proposal

Methodologies are not publicly known, derive significant economic value from their secrecy, and

are subject to reasonable efforts to maintain their secrecy.

27.      M&Q's Grant Proposal Methodologies include (i) client training documents;

(ii) processes and methodologies for grant proposals, including but not limited to M&Q's unique

compilations outlining strategies and best practices associated with specific grant programs

administered by various Federal agencies; (iii) templates used for grant proposals, including but

not limited to style guides, sample agendas, and project management tools; (iv) client onboarding

documents and handbooks; (v) client welcome packages related to grant proposal objectives; and

(vi) information about M&Q's grant consultant network and the individuals in such network.

M&Q uses this information to help clients develop an overarching grant strategy, to identify and

target funding opportunities that align with clients' strategic goals, and generally to streamline

the process of developing competitive grant applications for submissions to Federal agencies and

national foundations.

**B.      The M&Q "State of the Union"**

28.      M&Q creates an internal "state of the union" report on an annual basis (the

"M&Q State of the Union").  The M&Q State of the Union is not publicly known, contains

information that derives economic value from its secrecy, and is subject to reasonable efforts to

maintain its secrecy.

29.      The M&Q State of the Union includes the Firm's overall revenues, cost

structures, business model economics, and other sensitive financial data.  A competitor could use

this highly confidential information as a guide for pricing potential projects when bidding for work against M&Q, or to pitch business to existing M&Q clients.  Disclosure to M&Q's competitors of the M&Q State of the Union would cause significant economic and competitive harm to M&Q.

### C.     M&Q's Client Information

30.     M&Q's confidential and trade secret information includes information of third parties, such as information provided by clients, which M&Q has an obligation to keep confidential ("M&Q's Client Information").  M&Q's Client Information is not publicly known, derives significant economic value from their secrecy, and is subject to reasonable efforts to maintain their secrecy.

31.     M&Q's Client Information includes contracts, scopes of work, and project summaries associated with M&Q's clients.  M&Q's Client Information also includes information regarding contact information for key decision makers for each client and information regarding current, past, and prospective projects for each of M&Q's clients.

32.     M&Q's Client Information allows M&Q to better tailor its services for each client's needs, simplifies client communications and collaboration, and allows M&Q to anticipate additional or different services that may be required by its clients.  M&Q's Client Information provide M&Q with a substantial competitive advantage over its competitors who do not have this information and who do not know the quantity and quality of information maintained by M&Q.

33.     In M&Q's standard client contract, M&Q promises that confidential and proprietary information received from clients will be used by M&Q solely in connection with the performance of services pursuant to the contract.

7

34.     In addition, many of M&Q's clients require M&Q to sign their standard contract containing additional and more strenuous confidentiality obligations on M&Q related to the client's proprietary and confidential information.

35.     Whether under M&Q's standard client contract or under a client's standard contract, M&Q and its employees are not permitted to use the client's proprietary and confidential information for anything other than work to be performed by M&Q under the contracts.

## II.     Defendants' Employment with M&Q

36.     Venable began employment with M&Q on or about March 21, 2016 as a Managing Director.  Venable was hired to work in M&Q's Washington, D.C. office and regularly did so until the COVID-19 pandemic.

37.     On January 1, 2017, Venable was promoted to Executive Director.  Over the course of her time in that role, Venable was responsible for assisting M&Q Managing Partner Andy Quinn with managing his client portfolio and helping oversee M&Q's Research Universities Practice.  Among other duties, Venable researched, developed, planned, and executed grant seeking strategies for clients; oversaw proposal development; assembled proposal writing teams and managed the proposal preparation process; and provided training to Mr. Quinn's clients on grant seeking efforts.

38.     Venable was promoted to Vice President effective September 1, 2021.  As Vice President, among other duties, Venable began to work with Mr. Quinn to solicit and engage new clients and manage, oversee, and execute the new business.

39.     Tominovich began employment with M&Q on or about October 1, 2013 as a Vice President.  Tominovich was hired to work in M&Q's Washington, D.C. office and regularly did so until the COVID-19 pandemic.

40.     In his role as Vice President, Tominovich was responsible for soliciting and engaging new clients; managing, overseeing, and executing work for Firm clients; and managing employees who work with Firm clients.

41.     Fish began employment with M&Q on or about November 28, 2005 as Director of Federal Affairs.  Fish was hired to work in M&Q's Washington, D.C. office and regularly did so until the COVID-19 pandemic.

42.     Fish was promoted to Vice President on or about January 2008.

43.     In his role as Vice President, Fish was responsible for soliciting and engaging new clients; managing, overseeing, and executing work for Firm clients; and managing employees who work with Firm clients.

44.     Venable, Tominovich, and Fish were Vice Presidents at M&Q.  As such, in addition to their duties stated herein, they were in leadership roles at M&Q.  They reported directly to Managing Partners Andy Quinn and John McAllister, engaged in leadership activities and retreats, and participated in and contributed to Firm strategy decisions regarding business development.

45.     Lee began employment with M&Q on or about April 19, 2014 as Managing Director.  Lee was hired to work in M&Q's Washington, D.C. office and regularly did so until M&Q allowed Lee to work for M&Q from Connecticut and later from California.

46.     In her role as Managing Director, Lee was responsible for assisting Tominovich with managing work for Firm clients.  Among other duties, she researched, developed, plan, and

executed grant seeking strategies for Firm clients; oversaw proposal development; assembled proposal writing teams and managed the proposal preparation process; and provided training to Firm clients on grant seeking efforts.

47.     Newell began employment at M&Q on or about January 29, 2019 as Advanced Technology Fellow.  Newell was hired to work in M&Q's Washington, D.C. office and regularly did so until the COVID-19 pandemic.

48.     Newell was promoted to Advanced Technology Research Analyst on February 1, 2020 and then to Advanced Technology Senior Research Analyst on July 1, 2021.

49.     In his role as Advanced Technology Research Analyst and Senior Research Analyst, Newell was responsible for, among other duties, monitoring funding opportunities; tracking research and legislative initiatives; identifying areas of interest to Firm clients; supporting the design and implementation of marketing strategies; and providing research and content creation for Firm client projects.

50.     Parduhn began employment at M&Q on or about May 2, 2016 as a Fellow. Parduhn was hired to work in M&Q's Washington, D.C. office and regularly did so until the COVID-19 pandemic.

51.     Parduhn was promoted to Research Analyst on February 1, 2017, then to Director of Federal Affairs on April 1, 2018, and then to Managing Director of Federal Affairs on January 1, 2021.

52.     In his role as Managing Director, Parduhn was responsible for assisting Fish with managing work Firm clients.  Among other duties, he assisted clients in executing their government affairs strategies, analyzed and monitored legislative activity and appropriations

actions; prepared materials for and lead client meetings; assisted in the design and execute strategy for client appropriation requests; and identified new opportunities for Firm clients.

53.     Newell and Parduhn both began working at M&Q after graduating from school. Fish has not worked for any grant writing firm or government relations firm other than M&Q. Prior to joining M&Q, Tominovich had not worked in grant writing; he first began soliciting grant writing work and performing grant writing work at M&Q.  Venable's employment at M&Q was her first private-sector consulting position involving business development and private client service.  Lee did not have grant writing experience when she started at M&Q and received extensive training from M&Q in grant writing.  In short, all Defendants developed the grant writing skills and relationships they did because of the Firm's platform and reputation, the sharing of the Firm's confidential information and trade secrets with them, and training and mentoring they received from M&Q employees.

54.     Venable, Tominovich, and Fish reported to M&Q Founders and Managing Partners John McAllister and/or Andy Quinn and/or both.

55.     Lee reported to Tominovich.

56.     Newell and Parduhn reported to Fish.

57.     During their employment with M&Q, Defendants had access to M&Q's confidential and trade secret information.

58.     Among other information, Defendants gained access to M&Q's Grant Proposal Methodologies, the M&Q State of the Union, and M&Q's Client Information.  Such information could be used to compete unfairly with M&Q.

A.      **Defendants' Employment Agreements and Relevant Policies**

59.      In connection with their hiring and exposure to this information during their employment, each Defendant executed a Terms of Employment agreement ("Defendants' Agreements").  A true and correct copy of the agreement executed by Venable on December 14, 2015 ("Venable Agreement") is attached as Exhibit A to this Complaint.  A true and correct copy of the agreement executed by Tominovich on August 29, 2013 ("Tominovich Agreement") is attached as Exhibit B to this Complaint.  A true and correct copy of the agreement executed by Fish on November 28, 2005 ("Fish Agreement") is attached as Exhibit C to this Complaint.  A true and correct copy of the agreement executed by Lee on April 21, 2014 ("Lee Agreement") is attached as Exhibit D to this Complaint.  A true and correct copy of the agreement executed by Newell on January 1, 2020 ("Newell Agreement") is attached as Exhibit E to this Complaint.  A true and correct copy of the agreement executed by Parduhn on January 3, 2017 ("Parduhn Agreement") is attached as Exhibit F to this Complaint.

60.      Each of the Venable, Tominovich, Fish, Lee, Newell, and Parduhn Agreements were supported by valuable consideration, including new employment, access to confidential information, and salary, benefits, commissions, and other remuneration to be paid.

61.      In their respective agreements, each Defendant agreed that they would "keep confidential and not use, except for the benefit of [M&Q], information received from clients of [M&Q] under pledge of confidentiality or other information and documentation that is of value to [M&Q] and is not generally known to and might be of assistance to competitors of [M&Q]." The agreements provides that the obligations with regard to confidential information are in effect "during [] employment with [M&Q] and for a period of five (5) years thereafter."

12

62.     Each Defendant was also required to acknowledge that they received, read, and were familiar with M&Q's Employee Handbook.

63.     M&Q's Employee Handbook includes a "Confidentiality Policy," which defines "Confidential Information," prohibits employees from disclosing the confidential information of M&Q and its clients, and requires employees to take all reasonable precautions to prevent disclosure of such confidential information both during and after their employment with M&Q. Employees agree, by signing the Employee Handbook, that all "Confidential Information" is and remains the property of M&Q and/or its clients.

64.     Each Defendant in fact acknowledged receipt, review, and familiarity with the January 2020 McAllister & Quinn Employee Manual.

65.     In each of the Venable, Tominovich, Lee, Newell, and Parduhn Agreements Venable, Tominovich, Lee, Newell, and Parduhn agreed that they would not "during [their] employment with [M&Q] and for a period of two (2) years thereafter, . . . directly or indirectly, except for the benefit of [M&Q], provides services, whether on [their] own behalf on as an owner, partner, agent, consultant, or employee, to any individual or business that was a client of [M&Q] and with whom [they] worked at any time during the period of [their] employment, where such services are the same or substantially similar to those [they] provided during [their] employment."  Each of the Venable, Tominovich, Lee, Newell and Parduhn Agreements provides that "[f]or the purposes of [such] prohibition, clients of [M&Q] shall not include Introduced Clients. Introduced Clients are defined as those clients that you solely originate based on your work, experience, or personal relationships."

66.     In each of the Venable, Tominovich, Fish, Lee, Newell, and Parduhn Agreements, Venable, Tominovich, Fish, Lee, Newell, and Pardhun agreed and acknowledged that any breach

of the Agreement would cause M&Q to "suffer immediate and irreparable harm" and "[M&Q]'s remedies at law, including, without limitation, an award of money damages, would be inadequate relief to [M&Q] for any such violation."  They all also agreed that M&Q "will have the right to an injunction against [her] enjoining such breach issuable by a court of competent jurisdiction without any obligation on the part of [M&Q] to post bond as a condition of such relief."

67.    In the Fish Agreement, Fish agreed that he would not "for a period of two (2) years following termination of [his] employment with the firm, for any reason, . . . directly or indirectly, except for the benefit of [M&Q], own, manage, operate, control, advise, consult for, be employed by, participate in the ownership, management, operation, or control of, or be connected in other manner with . . . , any individual or business that was a client of [M&Q] at any time during the period of [his] employment."  The Fish Agreement provides that "[f]or the purposes of [such prohibition], clients of [M&Q] shall not include Introduced Clients. Introduced Clients are defined as those clients that you solely originate based on your work, experience, or personal relationships."

68.    Each of the Venable, Tominovich, Fish, Lee, Newell, and Parduhn Agreements contain a choice-of-law and mandatory forum-selection clause.  Under this provision, each Defendant consented to the jurisdiction of this Court and agreed that the substantive law of the District of Columbia would govern disputes between the parties.  Each Agreement provides substantially as follows:

> In the event a dispute should arise, this Agreement, including its validity, interpretation, and construction, will be governed by and construed in accordance with the substantive laws of the District of Columbia, and you agree that jurisdiction for the resolution of such dispute will lie exclusively with the courts of that jurisdiction.

*See, e.g.*, Ex. A at 2.

14

**B.    Defendants' Introduced Clients**

69.    During her employment at M&Q, Lee did not originate any clients based on her work, experience, or personal relationships.

70.    During his employment at M&Q, Newell did not originate any clients based on his work, experience, or personal relationships.

71.    During his employment at M&Q, Parduhn did not originate any clients based on his work, experience, or personal relationships.

72.    Among others, during her employment at M&Q, Venable solely originated the following clients based on her work, experience, or personal relationships, which will be referred to herein as "Venable's Introduced Clients":

Spelman College
The University of Illinois
The National Forum for Black Public Administrators

73.    Among others, during his employment at M&Q, Tominovich solely originated the following clients based on his work, experience, or personal relationships, which will be referred to herein as "Tominovich's Introduced Clients":

The Chemours Company
George Mason University
Main Line Health
MedStar Health
NeuroTrauma Sciences
Sinai Health
University of Maryland Baltimore County
FH Foundation
Kennedy Krieger Institute
Loyola University – Maryland
Villanova University
Virginia Wesleyan University
University of Michigan - Dearborn

74.     Among others, during his employment at M&Q, Fish solely originated the following clients based on his work, experience, or personal relationships, which will be referred to herein as "Fish's Introduced Clients":

Applied Materials
Broadcom
Clemson University
Connecticut Center for Advanced Technologies
Edwards Vacuum
EUV Technologies
Hoya Technologies
Integra Technologies
National Center Manufacturing Sciences
Tectus

75.     All clients identified in Paragraphs 72-74 were clients of M&Q, entered into engagement agreements with M&Q, were issued invoices by M&Q, and paid amounts owed to M&Q.

76.     None of the clients identified in Paragraphs 72-74 entered into engagement agreements with any of Venable, Tominovich, or Fish in their personal capacities.  None of Venable, Tominovich, or Fish issued invoices in their personal or individual capacities to such clients and none of these clients paid Venable, Tominovich, or Fish directly and in their personal or individual capacities for amounts owed.

77.     In M&Q's contracts with all of the clients identified in Paragraphs 72-74, M&Q – not Venable, Tominovich, or Fish in their personal or individual capacities – promised to keep M&Q's Client Information confidential.

## III.    Defendants abruptly and simultaneously resign from M&Q after withholding client termination notices from the Firm.

78.     On December 27, 2021, Tominovich was paid a bonus in the amount of $575,783.78 for the time period December 1, 2020 through November 30, 2021.

79.     Tominovich would have not have been paid such bonus if he was not employed at the Firm on December 27, 2021.

80.     On December 27, 2021, Fish was paid a bonus in the amount of $408,323.51 for the time period December 1, 2020 through November 30, 2021.

81.     Fish would have not have been paid such bonus if he was not employed at the Firm on December 27, 2021.

82.     On December 21, 2021, Lee was paid a bonus in the amount of $30,000 for the time period December 1, 2020 through November 30, 2021.

83.     Lee would have not have been paid such bonus if she was not employed at the Firm on December 27, 2021.

84.     On December 23, 2021, Newell was paid a bonus in the amount of $12,000 for the time period December 1, 2020 through November 30, 2021.

85.     Newell would have not have been paid such bonus if he was not employed at the Firm on December 23, 2021.

86.     On December 21, 2021, Parduhn was paid a bonus in the amount of $45,000 for the time period December 1, 2020 through November 30, 2021.

87.     Parduhn would have not have been paid such bonus if he was not employed at the Firm on December 21, 2021.

88.     On December 10, 2021, Venable entered M&Q's Washington, D.C. offices at 11:43 AM ET.  Venable removed items from her office and departed with them over a one-hour period.

17

89.     On January 1, 2022, Tominovich and Parduhn entered M&Q's Washington, D.C. offices at 2:10 PM ET and 2:45 PM ET, respectively.  Both Tominovich and Parduhn exited and re-entered the office more than once during a 20-minute window.

90.     Fish later entered M&Q's Washington, D.C. office at 9:10 PM EST.

91.     None of Venable, Tominovich, Parduhn or Fish scheduled their visits with M&Q Human Resources, as required by M&Q's separation of employment policies.

92.     On January 3, 2022, at 9:30 AM EST, Tominovich provided notice of resignation, effective immediately, by e-mail to Mr. McAllister and Mr. Quinn.  In the e-mail, Tominovich advised Mr. McAllister and Mr. Quinn of the clients he contended were his "Introduced Clients," advised Mr. McAllister and Mr. Quinn that such clients would not be maintaining their engagements with the Firm, and provided client termination letters from eight such clients.

93.     The client termination letters provided by Tominovich on January 3, 2022 were dated between December 1, 2021 and December 15, 2021.  Prior to January 3, 2022, Tominovich had not provided any of these client termination letters to M&Q, and nobody at M&Q was aware that the clients intended to terminate their engagements with M&Q.  Thus, for at least one month prior to announcing his resignation, Tominovich was orchestrating his resignation from M&Q, soliciting M&Q clients to terminate their agreements with M&Q, and actively and intentionally keeping his plans and his clients' termination letters a secret from M&Q.

94.     Tominovich provided termination letters from the following clients: The Chemours Company, George Mason University, Georgetown University, Main Line Health, MedStar Health, NeuroTrauma Sciences, Sinai Health, and University of Maryland Baltimore County.  Tominovich indicated that the University of Michigan – Dearborn would be sending a

18

termination notice to M&Q and that FH Foundation, Kennedy Krieger, Loyola University, Villanova University, and Virginia Wesleyan University would not be continuing their month-to-month engagements with M&Q.  The date of the termination letters and the notice of termination provisions in the clients' respective contracts with M&Q make evident that Tominovich secretly orchestrated the sending and receipt of the termination letters so that they would be timely under the clients' respective contracts with M&Q.

95.     On January 3, 2022, at 9:35 AM EST, Fish provided notice of resignation, effective immediately, by e-mail to Mr. McAllister and Mr. Quinn.  In the e-mail, Fish advised Mr. McAllister and Mr. Quinn of the clients he contended were his "Introduced Clients," advised Mr. McAllister and Mr. Quinn that such clients would not be maintaining their engagements with the Firm, and provided client termination letters from eight such clients.

96.     The client termination letters provided by Fish on January 3, 2022 were dated between November 1, 2021 and December 30, 2021.  Prior to January 3, 2022, Fish had not provided any of these client termination letters to M&Q, and nobody at M&Q was aware that the clients intended to terminate their engagements with M&Q.  Thus, for at least two months prior to announcing his resignation, Fish was orchestrating his resignation from M&Q, soliciting M&Q clients to terminate their agreements with M&Q, and actively and intentionally keeping his plans and his clients' termination letters a secret from M&Q.

97.     Fish provided termination letters from the following clients: Applied Materials, Inc., Broadcom, Inc., Edwards Vacuum, LLC, EUV Tech, Hoya Corporation USA, Integra Technologies, National Center for Manufacturing Sciences, and Tectus Corporation.  Fish indicated that Clemson University and CCAT would be sending termination notices to M&Q. The date of the termination letters and the notice of termination provisions in the clients'

19

respective contracts with M&Q make evident that Fish secretly orchestrated the sending and receipt of the termination letters so that they would be timely under the clients' respective contracts with M&Q.

98.     Tominovich's and Fish's conduct in keeping the client termination letters secret was contrary to M&Q practices.  In or around July 2016, Fish and Tominovich were reminded with all other Vice Presidents that they must disclose client termination notices immediately upon receipt.  That has been the practice and expectation before and since July 2016.

99.     Prior to their resignations, Tominovich and Fish had in fact notified M&Q immediately or soon after receiving client termination notice.  Their conduct in withholding client termination letters from M&Q's knowledge was both a departure from Firm practice and also from their own historical practices.

100.     In addition to not complying with the practice of immediately disclosing receipt of client termination letters, Tominovich misrepresented to Human Resources Administrator Katherine White why invoices to certain clients should be cancelled.  Tominovich told Ms. White not to send invoices to certain clients, without disclosing to her that such clients had provided termination notices or letters of termination.

101.     Further, Tominovich and Fish instructed Ms. White to send invoices for November work to their clients earlier than scheduled.  Upon information and belief, they gave this instruction in order for the revenue from such clients to be considered in the calculation of the bonuses they were paid on December 27, 2021.

102.     Finally, Vice President of Operations Cortney Watson met with Tominovich and Fish in October 2021 to discuss at-risk clients and client terminations.  Neither Tominovich nor Fish flagged any clients as at-risk or terminating.

103.    On January 3, 2022, at 9:38 AM EST, Venable provided notice of resignation, effective January 14, 2022, by e-mail to Mr. Quinn.

104.    Upon information and belief, Venable also orchestrated her resignation months in advance and with Defendants, to include but not limited to downloading and copying M&Q's confidential information and trade secrets.

105.    Tominovich's and Fish's e-mailed notices of resignation contained the following identical language:

> I am writing to provide notice of my resignation from McAllister & Quinn, effective immediately.  I want to make this transition smooth and ensure that you have no outstanding concerns with my departure.  To that end, here is a summary list of transition items in the attached document.

106.    Venable's e-mailed notice of resignation contained the following language:

> I am writing to provide my two weeks' notice of resignation from McAllister & Quinn. . . . I want to make this transition smooth and ensure that you have no outstanding concerns with my departure.  To that end, here is a summary list of transition items in the attached document.

107.    Upon information and belief, Tominovich authored a template resignation notice for each of Tominovich, Fish, and Venable to submit.

108.    On January 3, 2022, at 10:00 AM EST, Lee provided notice of resignation, effective immediately, to Tominovich.

109.    Upon information and belief, Tominovich solicited Lee to leave her employment at M&Q and engaged in such solicitation while both Tominovich and Lee were still employed by M&Q.

110.    On January 3, 2022, at 10:03 AM EST, Parduhn provided notice of resignation, effective immediately, by e-mail to Fish.

111.    On January 3, 2022, at 10:07 AM EST, Newell provide notice of resignation, effective immediately, by e-mail to Fish.

112.    Upon information and belief, Fish solicited Newell and Parduhn to leave their employment at M&Q and engaged in such solicitation while Fish, Newell, and Parduhn were still employed by M&Q.

113.    Upon information and belief, Tominovich, Fish, and Newell removed all paper files from their offices when they visited M&Q's Washington, D.C. offices on January 1, 2022.

114.    Lee's, Newell's, and Parduhn's e-mailed notices of resignation all contained the following identical language:

> I am writing to provide notice of my resignation to McAllister & Quinn, effective immediately.  I want to make this transition smooth and ensure that the firm has no outstanding concerns with my departure.  I will wait for guidance from McAllister & Quinn on internal and external messaging regarding my departure.  I will return all firm property.  I will contact HR about administrative items regarding benefits.

## IV.    Defendants begin employment with Thorn Run Partners, a direct competitor of M&Q, in breach of their Agreements.

115.    M&Q learned on January 3, 2022 that Defendants had all accepted positions at Thorn Run Partners ("Thorn Run").  All Defendants are currently employed by Thorn Run.

116.    Thorn Run is a Washington, D.C. company with its principal place of business at 100 M Street, SE – Suite 750, Washington, D.C 20003.  Thorn Run also has offices in Portland, Oregon and Los Angeles, California.

117.    Thorn Run is a government affairs firm and provides services to its clients that are the same as or substantially similar to the services provided by M&Q to its client.  However, significantly, Thorn Run currently cannot and does not match what M&Q is able to offer clients regarding grant consulting.  Thorn Run does not have the capabilities or business lines focused on providing grant consulting or grant writing like M&Q does.  Thorn Run does not have an

established grant consulting network like M&Q does.  M&Q's business model regarding grant consulting services, which is a trade secret, is of significant competitive value to Thorn Run.

118.    Thorn Run is a direct competitor of M&Q.

119.    Upon information and belief, Fish intends to or is currently providing services to Tominovich's Introduced Clients, including but not limited to University of Maryland Baltimore County, George Mason University, The Chemours Company, and the University of Michigan Dearborn.  Fish worked with these clients during his employment at M&Q.

120.    Upon information and belief, the services Fish is providing to Tominovich's Introduced Clients as an employee of Thorn Run are the same or substantially similar to those he provided to them during his employment at M&Q.

121.    Fish did not solely originate Tominovich's Introduced Clients based on his work, experience, or personal relationships.

122.    Upon information and belief, Venable intends to or is currently providing services to some or all of Tominovich's Introduced Clients and Fish's Introduced Clients, including but not limited to Georgetown University and Clemson University.  Venable worked with these clients during her employment at M&Q.

123.    Upon information and belief, the services Venable is providing to Tominovich's Introduced Clients and Fish's Introduced Clients as an employee of Thorn Run are the same or substantially similar to those she provided to them during her employment at M&Q.

124.    Venable did not solely originate Tominovich's Introduced Clients or Fish's Introduced Clients based on her work, experience, or personal relationships.

125.    Upon information and belief, Lee intends to or is currently providing services to some or all of Tominovich's Introduced Clients.  Lee worked with these clients during her employment at M&Q.

126.    Upon information and belief, the services Lee is providing to Tominovich's Introduced Clients as an employee of Thorn Run are the same or substantially similar to those she provided to them during her employment at M&Q.

127.    Lee did not solely originate Tominovich's Introduced Clients based on her work, experience, or personal relationships.

128.    Upon information and belief, Newell intends to or is currently providing services to Fish's Introduced Clients.  Newell worked with these clients during his employment at M&Q.

129.    Upon information and belief, the services Newell is providing to Fish's Introduced Clients as an employee of Thorn Run are the same or substantially similar to those he provided to them during his employment at M&Q.

130.    Newell did not solely originate Fish's Introduced Clients based on his work, experience, or personal relationships.

131.    Upon information and belief, Parduhn intends to or is currently providing services to Fish's Introduced Clients.  Parduhn worked with these clients during his employment at M&Q.

132.    Upon information and belief, the services Parduhn is providing to Fish's Introduced Clients as an employee of Thorn Run are the same or substantially similar to those he provided to them during his employment at M&Q.

133.    Parduhn did not solely originate Fish's Introduced Clients based on his work, experience, or personal relationships.

24

**V.     M&Q's internal investigation reveals Defendants downloaded thousands of documents' worth of the Firm's trade secrets before their coordinated resignations.**

134.    After receiving Defendants' coordinated resignations, M&Q undertook an internal investigation to identify any confidential or trade secret information that might have been compromised by Defendants.

135.    On January 6, 2022, M&Q's Managing Director of Information Technology, Casey Hébert, reviewed M&Q shared files, M&Q's Smartsheet account, and M&Q's SharePoint database—repositories of confidential Firm documents maintained by M&Q for use in the Firm's provision of grant consulting and government relations services.

136.     The file properties data contained in these sources showed extensive downloading, accessing, and/or copying of thousands of pages of Firm documents by Defendants, dating back as early as October 2021.  As detailed below, these documents reflect the Firm's confidential and trade secret information, and Defendants had no legitimate business need to download, access, and/or copy Firm documents on a mass basis or to maintain copies of these materials following their separations from M&Q.

137.     From December 9 to 31, 2021, Venable accessed and downloaded various documents comprising M&Q's Grant Proposal Methodologies and M&Q's Client Information. M&Q's internal investigation showed that, among other documents, Venable accessed and downloaded:

a.      Confidential client pipeline information related to Firm projects for Australian National University, University of California-Irvine, and Georgetown University;

b.      Confidential and proprietary lists of grant writer information contained in M&Q's proprietary grant writing network;

c.      Full project folders for various M&Q clients, including Clemson University, Dartmouth College, and Georgetown University; and

    d.      M&Q's confidential and proprietary style guides, templates, and sample grant and fellowship proposals.

138.    Venable has no legitimate reason for maintaining copies of these materials following her separation from M&Q.  The Venable Agreement required Venable not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Venable had no use beneficial to M&Q for the above information.

139.    From December 3 to 30, 2021, Tominovich accessed, downloaded, or sent to his personal email address various documents comprising M&Q's Grant Proposal Methodologies, the M&Q State of the Union, and M&Q's Client Information.  M&Q's internal investigation showed that, among other documents, Tominovich accessed, downloaded, or sent to his personal email address:

    a.      Confidential contracts, scopes of work, and proposals regarding ongoing M&Q work for Firm clients, including Georgetown University and the University of Michigan;

    b.      The M&Q "2021 State of the Union" slide deck, which contained detailed, current financial information for the Firm;

    c.      Nearly a dozen confidential and proprietary templates and guidebooks, including M&Q's New Client Welcome Package and Handbook, M&Q's New Client Onboarding Handbook, and a document titled "Identifying Client Capabilities in Engineering";

    d.      M&Q's confidential and proprietary list of all grant writing teams for M&Q clients on whose behalf Tominovich and Lee performed work in 2021; and

    e.      Confidential and proprietary analyses of legislation affecting M&Q clients, such as the bipartisan infrastructure bill of 2021.

140.    Tominovich has no legitimate reason for maintaining copies of these materials following his separation from M&Q.  The Tominovich Agreement required Tominovich not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Tominovich had no use beneficial to M&Q for the above information.

141.    From October 26 to November 5, 2021, Fish accessed, downloaded, or sent to his personal email address various documents comprising M&Q's Grant Proposal Methodologies and M&Q's Client Information.  M&Q's internal investigation showed that, among other documents, Fish accessed, downloaded, or sent to his personal email address:

       a.    Confidential presentations to Firm clients concerning U.S. Department of Defense funding and appropriations; and

       b.    A scope of services proposal for Firm client AIM Photonics, which contained information a Firm competitor could use to undercut M&Q's pricing for the services it provided the client.

142.    Fish has no legitimate reason for maintaining copies of these materials following his separation from M&Q.  The Fish Agreement required Fish not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Fish had no use beneficial to M&Q for the above information.

143.    From October 12 to December 21, 2021, Parduhn accessed and downloaded various documents comprising M&Q's Grant Proposal Methodologies and M&Q's Client Information.  M&Q's internal investigation showed that, among other documents, Parduhn accessed and downloaded:

       a.    Confidential and proprietary templates and guidebooks, including the Firm's New Client Onboarding Handbook;

       b.    Full project folders for various M&Q clients, including the University of Pittsburgh and the University of California-Irvine; and

       c.    M&Q's confidential and proprietary list of contact information for points of contact at the Firm's clients.

144.    Parduhn has no legitimate reason for maintaining copies of these materials following his separation from M&Q.  The Parduhn Agreement required Parduhn not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Parduhn had no use beneficial to M&Q for the above information.

145.    On December 15, 2021, Lee accessed and downloaded various documents comprising M&Q's Grant Proposal Methodologies.  M&Q's internal investigation showed that, among other documents, Lee accessed and downloaded:

      a.    Over a dozen confidential and proprietary Firm templates, spreadsheets, budgets, and other resources concerning the generation of grant proposals for the National Science Foundation and Department of Justice; and

      b.    The entirety of M&Q's confidential and proprietary "Grant Kit" for the National Science Foundation, which includes dozens of templates, samples, and guides for grant proposals for the National Science Foundation.

146.    Lee has no legitimate reason for maintaining copies of these materials following his separation from M&Q.  The Lee Agreement required Lee not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Lee had no use beneficial to M&Q for the above information.

147.    On December 6, 2021, Newell accessed and downloaded various documents concerning M&Q's Grant Proposal Methodologies and M&Q's Client Information.  M&Q's internal investigation showed that, among other documents, Newell accessed and downloaded:

      a.    Confidential and proprietary grant research performed by M&Q concerning grants previously awarded by the National Science Foundation; and

      b.    Confidential information concerning Firm clients Cabrini College and Fontbonne University, which M&Q compiled through a series of FOIA requests as examples of grant-proposal best practices.

148.    Newell has no legitimate reason for maintaining copies of these materials following his separation from M&Q.  The Newell Agreement required Newell not to use the Firm's confidential information except for the benefit of the Firm, but, on information and belief, Newell had no use beneficial to M&Q for the above information.

149.    Defendants made copies of the documents described above and sent various of the documents to Defendants' personal email addresses.  As a result, Defendants remain in possession of M&Q's confidential and trade secret information in breach of their employment agreements.

150.    M&Q's internal investigation is ongoing and the full scope of Defendants' misappropriation remains unknown.  Based on the extent of the misappropriation revealed in the early stages of M&Q's investigation, M&Q alleges on information and belief that Defendants engaged in further misappropriation of M&Q's confidential and trade secret information and ongoing use of M&Q's confidential and trade secret.

151.    On information and belief, Defendants worked with one another to coordinate their improper downloading of M&Q's confidential and trade secret information before their simultaneous resignations from the Firm.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract (Restrictive Covenant)**
**Against Fish, Venable, Lee, Newell, and Parduhn**

152.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 151 as if fully set forth herein.

153.    In connection with and as a condition of his employment by M&Q, Fish signed the Fish Agreement with M&Q, agreeing to its terms. The Fish Agreement is a valid and enforceable contract.

154.    In connection with and as a condition of her employment by M&Q, Venable signed the Venable Agreement with M&Q, agreeing to its terms. The Venable Agreement is a valid and enforceable contract.

155.     In connection with and as a condition of her employment by M&Q, Lee signed the Lee Agreement with M&Q, agreeing to its terms. The Lee Agreement is a valid and enforceable contract.

156.     In connection with and as a condition of his employment by M&Q, Newell signed the Newell Agreement with M&Q, agreeing to its terms. The Newell Agreement is a valid and enforceable contract.

157.     In connection with and as a condition of his employment by M&Q, Parduhn signed the Parduhn Agreement with M&Q, agreeing to its terms. The Agreement is a valid and enforceable contract.

158.     The Fish, Venable, Lee, Newell, and Parduhn Agreements are reasonable as to the restrictions placed upon them.  M&Q has a protectable interest in its client relationships, confidential information and trade secrets, and fruits of employment that is protected by the Fish, Venable, Lee, Newell, and Parduhn Agreements and which justify the enforcement of those Agreements.

159.     M&Q fully performed its obligations in accordance with the terms of the Fish Agreement, Venable Agreement, Lee Agreement, Newell Agreement, and Parduhn Agreement.

160.     Each of Fish, Venable, Lee, Newell, and Parduhn have breached the restrictive covenant provision of their agreements by doing work or providing services of the type that they agreed not to provide to clients for which they promised not to provide such services—the clients they had previously worked with at M&Q.

161.     In the Fish Agreement, Fish agreed that he would not "for a period of two (2) years following termination of [his] employment with the firm, for any reason, . . . directly or indirectly, except for the benefit of [M&Q], own, manage, operate, control, advise, consult for,

30

be employed by, participate in the ownership, management, operation, or control of, or be connected in other manner with . . . , any individual or business that was a client of [M&Q] at any time during the period of [his] employment."  The Fish Agreement provides that "[f]or the purposes of [such prohibition], clients of [M&Q] shall not include Introduced Clients. Introduced Clients are defined as those clients that you solely originate based on your work, experience, or personal relationships."

162.    In each of the Venable Agreement, Lee Agreement, Newell Agreement, and Parduhn Agreement, Venable, Lee, Newell, and Parduhn, respectively, agreed that they would not "during [their] employment with [M&Q] and for a period of two (2) years thereafter, . . . directly or indirectly, except for the benefit of [M&Q], provide services, whether on [their] own behalf or as an owner, partner, agent, consultant, or employee, to any individual or business that was a client of [M&Q] and with whom [they] worked at any time during the period of [their] employment, where such services are the same or substantially similar to those [they] provided during [their] employment."  Each of the Venable Agreement, Lee Agreement, Newell Agreement and Parduhn Agreement provides that for the purposes of such prohibition, "clients of [M&Q] shall not include Introduced Clients. Introduced Clients are defined as those clients that you solely originate based on your work, experience, or personal relationships."

163.    Among others, Fish provided services to Tominovich's Introduced Clients during his employment at M&Q ("Fish Restricted Clients"). Upon information and belief, Fish is providing services to the Fish Restricted Clients at Thorn Run.  The services being provided by Fish to the Fish Restricted Clients are the same or substantially similar to those services he provided to such clients during his employment at M&Q.  Fish did not solely originate the Fish

Restricted Clients based on his work, experience or personal relationships and is therefore prohibited from providing the services that he is providing to the Fish Restricted Clients

164.     Among others, Venable provided services to Tominovich's Introduced Clients and Fish's Introduced Clients during her employment at M&Q ("Venable Restricted Clients"). Upon information and belief, Venable is providing services to the Venable Restricted Clients at Thorn Run.  The services being provided by Venable to the Venable Restricted Clients are the same or substantially similar to those services she provided to such clients during her employment at M&Q.  Venable did not solely originate the Venable Restricted Clients based on her work, experience or personal relationships and is therefore prohibited from providing the services that she is providing to the Venable Restricted Clients.

165.     Among others, Lee provided services to Tominovich's Introduced Clients during her employment at M&Q ("Lee Restricted Clients"). Upon information and belief, Lee is providing services to the Lee Restricted Clients at Thorn Run.  The services being provided by Lee to the Lee Restricted Clients are the same or substantially similar to those services she provided to such clients during her employment at M&Q.  Lee did not solely originate the Lee Restricted Clients based on her work, experience or personal relationships and is therefore prohibited from providing the services that she is providing to the Lee Restricted Clients.

166.     Among others, Newell provided services to Fish's Introduced Clients during his employment at M&Q ("Newell Restricted Clients"). Upon information and belief, Newell is providing services to the Newell Restricted Clients at Thorn Run.  The services being provided by Newell to the Newell Restricted Clients are the same or substantially similar to those services he provided to such clients during his employment at M&Q.  Newell did not solely originate the Newell Restricted Clients based on his work, experience or personal relationships and is

therefore prohibited from providing the services that he is providing to the Newell Restricted Clients.

167.    Among others, Parduhn provided services to Fish's Introduced Clients during his employment at M&Q ("Parduhn Restricted Clients"). Upon information and belief, Parduhn is providing services to the Parduhn Restricted Clients at Thorn Run.  The services being provided by Parduhn to the Parduhn Restricted Clients are the same or substantially similar to those services he provided to such clients during his employment at M&Q.  Parduhn did not solely originate the Parduhn Clients based on his work, experience or personal relationships and is therefore prohibited from providing the services that he is providing to the Parduhn Restricted Clients.

168.    The restrictive covenant provision in each of the Fish, Venable, Lee, Newell, and Parduhn Agreements is narrowly tailored. The covenant prohibits each of Fish, Venable, Lee, Newell, and Parduhn from providing services to clients with whom they worked during their employment, where such services are the same or substantially similar to those they provided during their employment at M&Q.  The restrictive covenant provision is further limited to a two-year period following termination of employment.

169.    Fish, Venable Lee, Newell, and Parduhn began breaching the restrictive covenants of their agreements shortly after, and possibly before, their sudden resignations from M&Q, well within the two year period in which those restrictive covenants are effective.  They have continued those breaches, have refused to agree to cease their breaches, and threaten to continue to violate their obligations under their agreements with Plaintiff.

170.    Fish's, Venable's, Lee's, Newell's, and Parduhn's breaches have caused and will cause immediate and irreparable harm to M&Q.

171.     Fish, Venable, Lee, Newell, and Parduhn agreed, respectively, in the Fish, Venable, Lee, Newell, and Parduhn Agreements that M&Q would be irreparably harmed by breach of the Agreements and that M&Q would be entitled to injunctive relief to prevent or end such a breach.

172.     As a result of Fish's, Venable's, Lee's, Newell's, and Parduhn's breach of the Fish, Venable, Lee, Newell, and Parduhn Agreements, M&Q is entitled to equitable relief to bar their continued violation of the restrictive covenants.  To the extent that injunctive relief will not completely protect M&Q and provide it with compensation for compensable loss, M&Q is entitled to recover compensatory damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Contract (Confidentiality)
### Against all Defendants

173.     Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 172 of the Complaint as if fully set forth herein.

174.     Each of Defendants entered into agreements with M&Q, as evidenced by their signatures, in connection with their employment.  Those agreements, copies of which are attached as Exhibits A-E ("Defendants' Agreements"), protected M&Q's trade secret and confidential information from disclosure and misappropriation.

175.     Defendants' Agreements were supported by valid consideration, including the employment of Defendants individually, compensation, and by M&Q entrusting Defendants with its confidential and trade secret information.   The agreements were reasonable as to their restrictions and their scope and are valid and enforceable.

176.     Each of Defendants' Agreements provide the following:

So that the Firm may entrust you with full access to its confidential business information and the confidential business information of its clients without concern as to their

disclosure or use other than for the benefit of the Firm, you agree that, during your employment with the Firm and for a period of five (5) years thereafter, you will keep confidential and not use, except for the benefit of the Firm, information received from clients under of the Firm under a pledge of confidentiality or other information  and documentation that is of value to the Firm or is not generally known to and might be of assistance to competitors of the Firm.

177.    M&Q fully performed its obligations in accordance with the terms of Defendants' Agreements.

178.    In direct violation of the provisions of their agreements with M&Q, Defendants secretly took and, upon information and belief, have impermissibly used, the information of M&Q that was protected from such disclosure and misuse by those agreements.

179.    The information that was misappropriated was not generally known, is of value to M&Q, and might—indeed clearly would be—of assistance to a competitor of M&Q.

180.    Defendants, in doing the acts complained of herein, have or will use M&Q's Confidential Information and Trade Secrets in breach of their obligations under Defendants' Agreement.

181.    As a result of the above conduct, M&Q is entitled to equitable relief and to recover any compensatory damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act, 18 U.S.C. § 1836**
**Against all Defendants**

182.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 181 as if fully set forth herein.

183.    The Defend Trade Secrets Act ("DTSA") provides a cause of action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

184.    During their employment, M&Q granted Defendants access to trade secrets, including but not limited to M&Q's Grant Proposal Methodologies, the M&Q State of the Union, and M&Q's Client Information.  This information constitutes trade secrets under the DTSA because it derives economic value from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the information, and because the information is the subject of reasonable efforts under the circumstances to maintain its secrecy.  18 U.S.C. § 1839(3).

185.    M&Q's trade secrets relate to services the Firm provides clients across the United States and internationally.  M&Q uses its trade secrets to ensure the Firm's competitive advantage in providing services to clients in Australia, California, Texas, and Virginia, among others.

186.    Defendants had access to the trade secrets while serving as M&Q employees and under confidentiality obligations arising from Defendants' employment agreements.  These agreements obligated Defendants to maintain the confidentiality of the trade secrets and not to use them except for the benefit of M&Q.

187.    In doing the acts complained of herein, Defendants have used or will use M&Q's trade secrets without a privilege to do so, or are threatening to do so.  Defendants' conduct therefore qualifies as misappropriation under 18 U.S.C. § 1839(5), giving rise to the remedies described in 18 U.S.C. § 1836(b)(3).

188.    Upon information and belief, Defendants are using M&Q's trade secrets and confidential information in their new positions at Thorn Run.

189.    Defendants are in violation of the DTSA by misusing and disclosing trade secret information gained as a result of the employment relationship that Defendants enjoyed with

M&Q, or by threatening to do so in the future.  Defendants acts therefore constitute a violation of the DTSA.

190.    As a result of the above conduct, M&Q is entitled to preliminary and permanent equitable relief to bar Defendants' continued use of M&Q's trade secrets and to recover any compensatory damages in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets**
**D.C. Uniform Trade Secrets Act, D.C. Code §§ 36-401 *Et. Seq.***
**Against all Defendants**

191.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 190 as if fully set forth herein.

192.    The D.C. Uniform Trade Secrets Act ("DC UTSA") prohibits the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of the trade secret."  D.C. Code § 36-401(2)(B)(i). "Improper means" includes "breach of a duty to maintain secrecy," among other things.  *Id.* § 36-401(1).

193.    During their employment, M&Q granted Defendants access to trade secrets, including but not limited to M&Q's Grant Proposal Methodologies, the M&Q State of the Union, and M&Q's Client Information.  This information constitutes trade secrets under the DC UTSA because it derives economic value from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the information, and because the information is the subject of reasonable efforts under the circumstances to maintain its secrecy.  D.C. Code § 36-401(4).

194.    Defendants had access to the trade secrets while serving as M&Q employees and under confidentiality obligations arising from Defendants' employment agreements.  These

agreements obligated Defendants to maintain the confidentiality of the trade secrets and not to use them except for the benefit of M&Q.

195.    In doing the acts complained of herein, Defendants have used or will use M&Q's trade secrets without a privilege to do so, or are threatening to do so.  Defendants' conduct therefore qualifies as misappropriation under D.C. Code § 36-401(2), giving rise to the remedies described in D.C. Code §§ 36-402 through 36-404.

196.    Upon information and belief, Defendants are using M&Q's trade secrets and confidential information in their new positions at Thorn Run.

197.    Defendants are in violation of the DC UTSA by misusing and disclosing trade secret information gained as a result of the employment relationship that Defendants enjoyed with M&Q, or by threatening to do so in the future.  Defendants acts therefore constitute a violation of the DC UTSA.

198.    As a result of the above conduct, M&Q is entitled to preliminary and permanent equitable relief to bar Defendants' continued use of M&Q's trade secrets or, in the alternative, to recover any compensatory damages in an amount to be proven at trial.  In addition, M&Q is entitled to recover its attorneys' fees based on Defendants' willful and malicious misappropriation of M&Q's trade secrets.  D.C. Code § 36-404.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy
### Against all Defendants

199.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 198 as if fully set forth herein.

200.    Without the consent or approval of M&Q, and in direct breach of their contractual commitments to M&Q, Defendants agreed and conspired with one another for many months

prior to their mass January 3 resignations to misappropriate M&Q's confidential and trade secret information and use the same in the course of their employment with Thorn Run.

201.    Upon information and belief, Defendants accessed and downloaded M&Q's Confidential Information and Trade Secrets to be able to use such information to work for and for the benefit of a competitor.

202.    As a result of Defendants' conspiracy to misappropriate M&Q's trade secrets, and the resultant misappropriation committed in furtherance of the conspiracy, M&Q has suffered direct and proximate economic injury and has suffered damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Against All Defendants**

203.    Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1 through 202 as if fully set forth herein.

204.    All Defendants were employed by M&Q and were paid wages by M&Q.  At all times, M&Q retained the right to control and direct their work performance, to control the manner in which they conducted their work, and to potentially discharge the Defendants from their employment.  Thus, all Defendants were agents of M&Q and had a fiduciary duty to act loyally for M&Q's benefit in all matters connected with their relationship with M&Q.

205.    Further, Defendants Venable, Tominovich, and Fish were Vice Presidents of M&Q and were employed by M&Q in leadership positions.  They reported directly to Managing Partners Andy Quinn and John McAllister, engaged in leadership activities and retreats, and participated in and contributed to Firm strategy decisions regarding business development.  They had a fiduciary duty to M&Q while they held their positions of trust.

206.     At all times during their employment with M&Q, M&Q trusted Defendants and placed confidence in and relied upon their obligations of integrity and fidelity to M&Q.

207.     While employed by M&Q, Defendants were barred by their fiduciary duty to M&Q from actively competing with M&Q or deliberately harming its interests.

208.     While employed by M&Q, Defendants were required by their fiduciary duty owed to M&Q to disclose competitive activity that might be harmful to M&Q.

209.     Upon information and belief, while employed by M&Q, Tominovich and Fish encouraged clients to terminate their contractual relationships with M&Q and, to that end, obtained termination letters or commitments from clients.  Such activity was harmful to M&Q.  Further, Tominovich and Fish intentionally, purposefully and contrary to M&Q practice did not disclose their activities or the termination letters to M&Q while employed by M&Q.

210.     Upon information and belief, while employed by M&Q, Venable, Tominovich, and Fish solicited Lee, Newell, and Parduhn to resign from their employment at M&Q to work for a competitor.  Such activity was harmful to M&Q, and further Venable, Tominovich and Fish did not disclose it to M&Q while employed by M&Q.

211.     Upon information and belief, while employed by M&Q, Defendants all misappropriated M&Q's Confidential Information and Trade Secrets in preparation to go to work for a competitor.

212.     While employed by M&Q, Defendants intentionally acted in ways to knowingly harm M&Q and to put them into direct competition with M&Q's best interests.

213.     M&Q has been damaged and continues to be damaged by these multiple breaches of fiduciary duty.  As a result, M&Q is entitled to equitable relief to prevent further injury, and to the award of actual damages to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### Tortious Interference with Contract
### Against Venable, Tominovich and Fish

214.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 213 as if fully set forth herein

215.    M&Q maintains employment agreements and employment relationships with its employees.

216.    M&Q had such agreements with Venable, Tominovich and Fish, attached as Exhibits A-C.  Venable, Tominovich, and Fish were aware of M&Q's employment agreements and employment relationships with its other employees.

217.    M&Q has agreements with Lee, Newell, and Parduhn, attached as Exhibits D-E, that contain restrictions on Lee's, Newell's, and Parduhn's employment and post-employment activities.

218.    Such restrictions in the Lee, Newell, and Parduhn Agreements are nearly identical to the restrictions in the Venable, Tominovich, and Fish Agreements.

219.    Venable, Tominovich, and Fish are not parties to M&Q's employment agreements with its employees and, therefore, they are each a stranger to the agreements and relationships.

220.    Venable, Tominovich, and Fish intentionally procured breaches of the Lee, Newell, and Parduhn Agreements by encouraging Lee, Newell, and Parduhn, respectively, to perform work for clients that is prohibited by such Agreements, by permitting them to perform such prohibited work, by offering or assigning such prohibited work to them, and by encouraging them to perform such prohibited work in violation of their binding contracts with Plaintiff..

221.    Venable's, Tominovich's, and Fish's tortious conduct has proximately caused damages to M&Q in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### Attorneys' Fees and Litigation Expenses
### Against all Defendants

222.    Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1

through 221 as if fully set forth herein.

223.    As alleged above, Defendants have acted willfully and maliciously in

misappropriating M&Q's confidential and trade secret information.  M&Q therefore is entitled to

recover from Defendants its attorneys' fees and expenses of litigation.  18 U.S.C.

§ 1836(b)(3)(D); D.C. Code § 36-404.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff M&Q respectfully prays:

a.      That the Court grant M&Q injunctive relief preliminarily and permanently

enjoining Defendants from using M&Q's trade secrets and confidential information through their

continued employment at Thorn Run or otherwise, requiring Defendants to return to M&Q all

originals and copies of confidential and trade secret information obtained by Defendants from

M&Q, and requiring Defendants permanently to destroy all electronic versions of such

confidential and trade secret information;

b.      That the Court award M&Q compensatory damages resulting from the

breach of restrictive covenants by Fish, Venable, Lee, Newell, and Parduhn;

c.      That the Court award M&Q compensatory damages resulting from the

breach of confidentiality obligations by all Defendants;

d.      That the Court award M&Q compensatory damages resulting from the

misappropriation of M&Q's trade secrets by all Defendants;

e.      That the Court award M&Q exemplary damages and attorneys' fees for the willful and malicious misappropriation of M&Q's trade secrets by all Defendants;

f.      That the Court award M&Q compensatory damages resulting from the breach of fiduciary duty by Venable, Tominovich, and Fish;

g.      That the Court award M&Q compensatory damages resulting from the breach of duty of loyalty by Lee, Newell, and Parduhn;

h.      That the Court award M&Q compensatory damages resulting from the tortious interference with contract by Venable, Tominovich, and Fish;

i.      That the Court award M&Q attorneys' fees;

j.      That all costs of this action be assessed against Defendants; and

k.      For such other relief as the Court deems just and proper.

This 11th day of February, 2022.

<table>
<tr><td></td><td>/s/ Alexander M. Bullock</td></tr>
</table>

Kathleen B. Dodd Barton
(*to be admitted pro hac vice*)
kbarton@kilpatricktownsend.com
Joel D. Bush, II
(*to be admitted pro hac vice*)
jbush@kilpatricktownsend.com
**KILPATRICK TOWNSEND &
  STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4530
Telephone:  (404) 815-6500
Facsimile: (404) 815-6555

Alexander M. Bullock
D.C. Bar No. 446168
abulloch@kilpatricktownsend.com
**KILPATRICK TOWNSEND &
  STOCKTON LLP**
607 14th Street, NW
Suite 900
Washington, DC  20005
Telephone:  (202) 824-1416
Facsimile:  (202) 585-0065

*Counsel for Plaintiff McAllister & Quinn, LLC*

## <u>VERIFICATION</u>

I, Cortney Watson, being duly sworn, under penalty of perjury declare the following:

That I have read the above and foregoing Verified Complaint; that I know the contents thereof; that I am authorized to make this verification on McAllister & Quinn, LLC's behalf; that I either have personal knowledge of the facts contained in the Verified Complaint or that the facts stated therein are based on the knowledge of others who are employed by or affiliated with McAllister & Quinn, LLC; and that all of the facts stated therein are true and accurate to the best of my knowledge and belief.

This 11th day of February, 2022.

Cortney Watson
Vice President of Operations
McAllister & Quinn, LLC

44