IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MCALLISTER & QUINN, LLC,

      Plaintiff,

          vs.

JESSICA VENABLE, SCOTT TOMINOVICH,
CHRIS FISH, JOO YOUNG LEE, CASEY
NEWELL, and JAKE PARDUHN,

      Defendants.

Case No.  1:22-CV-00379-APM

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Joel D. Bush, II
(*admitted pro hac vice*)
jbush@kilpatricktownsend.com
Kathleen B. Dodd Barton
(*admitted pro hac vice*)
kbarton@kilpatricktownsend.com
**KILPATRICK TOWNSEND &
  STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

Alexander M. Bullock
D.C. Bar No. 446168
abullock@kilpatricktownsend.com
**KILPATRICK TOWNSEND &
  STOCKTON LLP**
607 14TH Street, NW
Suite 900
Washington, DC  20005
Telephone:  (202) 508-5831
Facsimile:  (202) 585-0057

*Counsel for Plaintiff McAllister & Quinn, LLC*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

SUMMARY OF PLAINTIFF'S ALLEGATIONS ........................................................1

ARGUMENT ..................................................................................................................4

    I.      M&Q plausibly alleged breach of contract. ...........................................5

          A.     The Complaint states a claim for breach of Defendants' restrictive covenant obligations. ...................................................................5

          B.     The Complaint states a claim for breach of Defendant's confidentiality obligations. .......................................................................8

    II.     M&Q plausibly alleged misappropriation of trade secrets. ..................11

    III.    M&Q plausibly alleged attorney's fees and litigation expenses for Defendants' trade secret violations. ......................................................17

    IV.    M&Q plausibly alleged breach of fiduciary duty. ................................18

    V.     M&Q plausibly alleged tortious interference. ......................................21

    VI.    M&Q plausibly alleged civil conspiracy. ............................................25

CONCLUSION.............................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Alemayehu v. Abere*,
199 F. Supp. 3d 74 (D.D.C. 2016) ........................................................................... 23, 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................ 4

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ..................................................................................... 24

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ...................................................................................... 1, 9

*Burnett v. Am. Fed'n of Gov't Emps.*,
102 F. Supp. 3d 183 (D.D.C. 2015) ............................................................................... 5, 9

*Catalyst & Chem. Servs., Inc. v. Glob. Grounds Support*,
350 F. Supp. 2d 1 (D.D.C. 2004) ................................................................................... 13

*Democracy Partners v. Project Veritas Action Fund*,
285 F. Supp. 3d 109 (D.D.C. 2018) ............................................................................... 25

*Deutsch v. Barsky*,
795 A.2d 669 (D.C. 2002) ................................................................................................ 8

*Draim v. Virtual Geosatellite Holdings, Inc.*,
631 F. Supp. 2d 32 (D.D.C. 2009) ................................................................................. 16

*E.I. DuPont deNemours & Co. v. Christopher*,
431 F.2d 1012 (5th Cir. 1970) ....................................................................................... 13

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
208 F. Supp. 3d 219 (D.D.C. 2016) ............................................................................... 12

*Ellis v. James V. Hurson Assocs., Inc.*,
565 A.2d 615 (D.C. 1989) ................................................................................................ 8

*Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ......................................................................................... 7

*FMC Corp. v. Varco Int'l, Inc.*,
677 F.2d 500 (5th Cir. 1982) ......................................................................................... 15

*Furash & Co. v. McClave*,
130 F. Supp. 2d 48 (D.D.C. 2001) ................................................................................. 20

*Gov't Rels Inc. v. Howe,*
   No. Civ.A. 05-1081 CKK, 2007 WL 201264 (D.D.C. Jan. 24, 2007) .................................... 25

*Harris v. D.C. Water & Sewer Auth.,*
   791 F.3d 65 (D.C. Cir. 2015) ........................................................................................... 4

*Hedgeye Risk Mgmt., LLC v. Heldman,*
   412 F. Supp. 3d 15 (D.D.C. 2019) ..................................................................................... 16

*HIRECounsel D.C., LLC v. Connolly,*
   No. 20-3337 (EGS), 2021 WL 5998365 (D.D.C. Dec. 20, 2021) ........................................... 13

*Hosp. Staffing Sols., LLC v. Reyes,*
   736 F. Supp. 2d 192 (D.D.C. 2010) ................................................................................... 11

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.,*
   928 F.3d 42 (D.C. Cir. 2019) ........................................................................................... 17

*Intertek Testing Servs., N.A. v. Pennisi,*
   443 F. Supp. 3d 303 (E.D.N.Y. 2020) ............................................................................... 16

*Kemp v. Eiland,*
   139 F. Supp. 3d 329 (D.D.C. 2015) ................................................................................... 18

*Mahoney v. United States Cap. Police Bd.,*
   No. 21-2314 (JEB), 2022 WL 523009 (D.D.C. Feb. 22, 2022) ....................................... 7, 9

*Mercer Mgmt. Consulting v. Wilde,*
   920 F. Supp. 219 (D.D.C. 1996) ....................................................................................... 19

*Meyer Grp., Ltd. v. Rayborn,*
   No. 19-1945 (ABJ), 2020 WL 5763631 (D.D.C. Sept. 28, 2020) .................................... 11, 14

*NCB Mgmt. Servs., Inc. v. FDIC,*
   843 F. Supp. 2d 62 (D.D.C. 2012) ................................................................................ 23, 25

*Park v. Hyatt Corp.,*
   436 F. Supp. 2d 60 (D.D.C. 2006) ..................................................................................... 21

*PepsiCo, Inc. v. Redmond,*
   54 F.3d 1262 (7th Cir. 1995) ....................................................................................... 10, 15

*Phillips v. Mabus,*
   894 F. Supp. 2d 71 (D.D.C. 2012) ............................................................................ 18, 19, 20

*Riordan v. State Farm Mut. Auto. Ins. Co.,*
   589 F.3d 999 (9th Cir. 2009) ........................................................................................... 17

*Robert Half Int'l Inc. v. Billingham,*
  317 F. Supp. 3d 379 (D.D.C. 2018) ................................................................ 25

*Ruesch v. Ruesch Int'l Monetary Servs., Inc.,*
  479 A.2d 295 (D.C. 1984) ............................................................................. 12

*Shaffer v. George Wash. Univ.,*
  27 F.4th 754 (D.C. Cir. 2022) ........................................................................ 1

*Sparrow v. United Air Lines, Inc.,*
  216 F.3d 1111 (D.C. Cir. 2000) ..................................................................... 14

*Tsintolas Realty Co. v. Mendez,*
  984 A.2d 181 (D.C. 2009) ............................................................................... 5

*United Indus., Inc. v. Simon-Hartley, Ltd.,*
  91 F.3d 762 (5th Cir. 1996) ........................................................................... 18

*Wells v. Gray,*
  17 F. Supp. 3d 27 (D.D.C. 2014) ............................................................... 4, 11

*Zimmerman v. Al Jazeera Am., LLC,*
  246 F. Supp. 3d 257 (D.D.C. 2017) ........................................................ 10, 14

**Statutes**

18 U.S.C. § 1836(b)(3)(D) ................................................................................ 17

18 U.S.C. § 1839(3) .......................................................................................... 11

18 U.S.C. § 1839(5) .......................................................................................... 14

18 U.S.C. § 1839(6)(A) ............................................................................... 11, 14

D.C. Code § 36-401(1) ................................................................................ 11, 14

D.C. Code § 36-401(2) ...................................................................................... 14

D.C. Code § 36-401(4) ...................................................................................... 11

D.C. Code § 36-404(3) ...................................................................................... 17

D.C. Code § 36-407(a) ...................................................................................... 19

**Rules & Regulations**

Fed. R. Civ. P. 8(a)(2) .................................................................................. 4, 11

Fed. R. Civ. P. 9(g) .................................................................................... 17, 18

Fed. R. Civ. P. 12(b)(6)............................................................................... 1, 4, 5, 14

Fed. R. Civ. P. 54(d)(2)......................................................................................... 17

**Other Authorities**

5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1310 (4th ed. 2021)....... 17, 18

Restatement (Second) of Agency § 396(b) (1958) ...................................................... 16

Plaintiff McAllister & Quinn, LLC ("M&Q," the "Firm," or "Plaintiff"), respectfully files this Opposition to Defendants' Motion to Dismiss ("Motion"), Dkt. 26, and states as follows:

## INTRODUCTION

It is axiomatic that courts resolve motions to dismiss under Rule 12(b)(6) by "[a]ccepting . . . complaints' factual allegations as true and drawing all reasonable inferences from those allegations in [p]laintiffs' favor." *Shaffer v. George Wash. Univ.*, 27 F.4th 754, 763 (D.C. Cir. 2022). It is just as axiomatic that courts "do not assess . . . whether a plaintiff has any evidence to back up what is in the complaint" at this stage. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quotation omitted). Nevertheless, significant portions of Defendants' Motion to Dismiss ignore—and contradict—these foundational principles. Instead of carefully reviewing the allegations and accounting for reasonable inferences, Defendants make arguments that entirely overlook broad swaths of Plaintiff's Complaint. And instead of crediting the allegations as true, Defendants insist that "M&Q has not conclusively established" certain evidentiary facts, Mot. 12, or that "M&Q cannot provide facts," *id.* at 23. Defendants' approach turns both the Complaint and the purpose of notice pleading on their head. Applying the proper standards, however, it is clear that Plaintiff adequately alleges each of its claims.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff M&Q is a premier federal grant consulting and government relations firm that services a diverse group of clients across a number of industries in the United States and throughout the world. Dkt. 1, Verified Complaint ("Compl.") ¶ 15. In connection with its services, M&Q has invested significant time and money to develop and refine confidential information and resources that enable it to better serve its clients. *Id.* ¶¶ 18–20. These confidential materials—which include grant proposal methodologies developed in-house, an internal "state of the union" financial report, and sensitive client information—are either not

publicly available or are compiled from publicly available information through significant effort. *Id.* ¶¶ 20, 26–28, 30–31. As such, M&Q's confidential materials give it a leg up over competitors who have not devoted the time or resources to develop the same level of expertise in the grant consulting industry. *Id.* ¶ 19. Against this background, among other measures, M&Q requires each of its employees to sign an employment agreement containing a confidentiality provision and a restrictive covenant when they join the Firm. *Id.* ¶¶ 23, 59.

Defendants Jessica Venable, Scott Tominovich, Chris Fish, Joo Young Lee, Casey Newell, and Jake Parduhn (collectively "Defendants") started working for M&Q at various points between November 2005 (Fish) and January 2019 (Newell). *Id.* ¶¶ 36, 39, 41, 45, 47, 50. All Defendants signed materially similar confidentiality provisions, which obligate Defendants to "keep confidential and not use information received from clients of [M&Q] under pledge of confidentiality or other information and documentation that is of value to [M&Q] and is not generally known to and might be of assistance to competitors of [M&Q]." *Id.* ¶ 61. Defendants also agreed to abide by a restrictive covenant, which prohibits them from providing post-termination services to M&Q clients that resemble the services they offered to those same clients while employed by M&Q. *Id.* ¶ 65. A narrow exception to the restrictive covenant permits M&Q employees to service "Introduced Clients" that they "solely originated" at the Firm. *Id.* Only Venable, Tominovich, and Fish solely originated any Introduced Clients during their employment. *Id.* ¶¶ 69–74.

At some point in or before late 2021, Defendants collectively decided they would leave M&Q and begin working for one of M&Q's direct competitors. *Id.* ¶¶ 115–18. Just days after receiving their year-end bonuses, all six Defendants submitted their resignations via email on January 3, 2022, within 37 minutes of each other. *Id.* ¶¶ 1, 78–87, 92, 95, 103, 108, 110–11.

Defendants Tominovich and Fish emailed first—both of whom claimed they would be leaving with Introduced Clients, and both of whom attached client termination letters that they had procured while working for the Firm and then concealed for up to two months in violation of Firm practice and expectation. *Id.* ¶¶ 2, 92–98. Venable submitted her notice of resignation shortly thereafter, and Venable, Fish, and Tominovich used a notice template that Tominovich had authored in advance. *Id.* ¶¶ 103, 105–07. Lee, Newell, and Parduhn followed, all three of whom used identical email notices to effect their resignations. *Id.* ¶¶ 108, 110–11, 114. Upon information and belief, Tominovich solicited Lee to leave the Firm while still employed as her direct supervisor, and Fish solicited Newell and Parduhn to leave the Firm while still employed as their direct supervisor. *Id.* ¶¶ 55–56, 109, 112.

M&Q learned on the day of the resignations that all six Defendants had accepted positions at Thorn Run Partners ("Thorn Run"). *Id.* ¶ 115. Thorn Run is a direct competitor of M&Q and provides services to its clients that are the same as or substantially similar to the services provided by M&Q. *Id.* ¶¶ 117–18. However, Thorn Run does not have the capabilities or business lines focused on providing grant consulting or grant writing like M&Q does. *Id.* ¶ 117. Upon information and belief, Defendants Fish, Venable, Lee, Newell, and Parduhn intend to and are currently violating their restrictive covenants by working on behalf of Thorn Run with clients that they serviced but did not introduce at M&Q. *Id.* ¶¶ 119–33, 160, 163–67, 169.

Blindsided by a mass resignation involving one-tenth of its workforce, M&Q began an investigation into Defendants' use of the Firm's confidential and trade secret information. *Id.* ¶¶ 1, 3, 134. This investigation revealed that Defendants, on the eve of their departures, had each downloaded, accessed, copied, and forwarded to their personal email addresses thousands of Firm documents containing confidential and trade secret information. *Id.* ¶¶ 135–49. Defendants

3

had no legitimate reason for maintaining copies of these materials following their termination but retained them anyway in violation of their signed confidentiality agreements. *Id.* ¶¶ 138, 140, 142, 144, 146, 148–49. M&Q alleges on information and belief that Defendants are using the Firm's confidential and trade secret information as part of their services provided to Thorn Run. *Id.* ¶¶ 150, 178, 180, 187–89, 195–97.

In light of the foregoing and other allegations in the Complaint, M&Q sued Defendants for breach of their restrictive covenants, breach of their confidentiality agreements, misappropriation of trade secrets under the Federal Defend Trade Secrets Act ("DTSA"), misappropriation of trade secrets under the D.C. Uniform Trade Secrets Act ("DCUTSA"), attorney's fees under the DTSA and DCUTSA, breach of fiduciary duty, tortious interference with contractual relations, and civil conspiracy. *Id.* ¶¶ 152–223. Defendants subsequently filed their Motion to Dismiss all claims, Dkt. 26, to which M&Q now responds.

## ARGUMENT

This Court must deny Defendants' Motion to Dismiss so long as Plaintiff's Complaint contains a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2), 12(b)(6). The "short and plain statement" requirement exists to "ensure[] that defendants receive fair notice of the claim being asserted so that they can prepare a responsive answer." *Wells v. Gray*, 17 F. Supp. 3d 27, 28 (D.D.C. 2014). To satisfy it, claimants need only plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, M&Q's Complaint must simply contain "factual content that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Id.* (quotation omitted). M&Q amply satisfies this standard for each of its claims.

## I.      M&Q plausibly alleged breach of contract.

M&Q brings two separate claims for breach of contract stemming from employment agreements Defendants signed upon beginning work for the Firm. First, M&Q alleges that Defendants Fish, Venable, Lee, Newell, and Parduhn violated the restrictive covenant in their employment agreements that prohibits them from working with M&Q clients for two years following termination of Firm employment. Compl. ¶¶ 152–72 (Count I). Second, M&Q alleges that all Defendants violated the confidentiality provision in their employment agreements that prohibits them from using or disclosing M&Q's confidential information except for the benefit of the Firm. *Id.* ¶¶ 173–81 (Count II). Defendants are liable under both claims if M&Q can demonstrate "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 192 (D.D.C. 2015) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). "To state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss," M&Q need only "describe the terms of the alleged contract and the nature of the defendant's breach." *Id.* (quotation omitted). As explained below, Plaintiff's Complaint sufficiently alleges each of the required elements, and Defendants' arguments to the contrary lack merit.

### A.      The Complaint states a claim for breach of Defendants' restrictive covenant obligations.

M&Q brings its first breach of contract claim against Defendants Fish, Venable, Lee, Newell, and Parduhn (the "Restrictive Covenant Defendants"). M&Q has pleaded that (1) the Restrictive Covenant Defendants entered into employment agreements with M&Q; (2) these employment agreements prohibit the Restrictive Covenant Defendants from providing certain services to M&Q clients after leaving the Firm (with the exception of "Introduced Clients" as

5

that term is defined in the agreements); (3) the Restrictive Covenant Defendants breached this

obligation; and (4) M&Q has suffered damages as a result of their breach. Compl. ¶¶ 153–57,

160–70.  Therefore, M&Q has stated a claim upon which relief may be granted.

The Restrictive Covenant Defendants refuse to engage with these allegations, contending

instead that their employment agreements "cannot be enforced" because of a perceived

ambiguity regarding the scope of the "Introduced Clients" exception. Mot. 16. But Defendants'

post-employment restrictions are unambiguous. First comes the general rule:

> You further agree that, during your employment with the Firm and for a period of
> two (2) years thereafter, you will not . . . provide services . . . to any individual or
> business that was a client of the Firm and with whom you worked at any time
> during the period of your employment, where such services are the same or
> substantially similar to those you provided during your employment.

Compl. ¶ 162 & Exs. A, D–F.[1] And then comes the narrow exception:

> For purposes of this last prohibition, clients of the Company shall not include
> Introduced Clients. Introduced Clients are defined as those clients that you solely
> originate based on your work, experience or personal relationships.

*Id.* In other words, the agreements unambiguously prohibit the Restrictive Covenant Defendants

from working with clients they had worked for in the past at M&Q. The only exception is for

clients that Defendants "solely originate[d]." M&Q has alleged (and Defendants do not deny)

that the Restrictive Covenant Defendants are working for clients with whom they worked at

M&Q that they did not "solely originate." *Id.* ¶¶ 160, 163–67, 169. M&Q has thus alleged

breaches of this restrictive covenant obligation.

Although Defendants claim that the agreements "lack[] a provision regarding working

with the Introduced Clients of *other people*," Mot. 16, this actually undercuts their argument. If,

---

[1] Defendant Fish signed an agreement that was slightly different, but not in material respects. *See
id.* ¶ 161 & Ex. C.

as they admit, there is no stated applicable exception to the provision that clearly prohibits their conduct, that conduct is prohibited. Further, the Introduced Clients of *other people* naturally cannot be the Introduced Clients of the Restrictive Covenant Defendants. After all, the narrow carve-out limits Introduced Clients to clients that an employee "*solely*" originated. Compl. ¶ 162. Defendants' under-explained argument to the contrary does violence to the plain language of the agreements, and Defendants' claim that they breached a "nonexistent provision" therefore fails. The provision they breached is the default rule clearly set forth in the agreements. Mot. 17.

Defendants also argue that the post-employment obligations are unenforceable because they run afoul of public policy. *Id.* This argument lacks merit too: Defendants do not provide a single case that meaningfully supports their public policy argument, nor do they provide any example of a D.C. court granting a motion to dismiss a restrictive covenant claim on this basis. Indeed, at the motion to dismiss stage, the Court "may weigh only 'the facts alleged in the complaint,' 'any documents either attached to or incorporated in the complaint, and matters of which courts may take judicial notice.'" *Mahoney v. United States Cap. Police Bd.*, No. 21-2314 (JEB), 2022 WL 523009, at *8 (D.D.C. Feb. 22, 2022) (quoting *Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). This rule prohibits the Court from considering individualized facts about the Restrictive Covenant Defendants' purported "undue hardship," because those "facts" are beyond the scope of the Complaint. Mot. 18.

Furthermore, nothing in the Complaint suggests the restrictive covenant is unreasonable. Defendants' employment agreements allow them to work *anywhere* and merely prohibit them for two years from servicing M&Q clients with whom they previously worked while employed at M&Q. Defendants acknowledge that "M&Q is one of many government relations and federal

grant consulting firms located in the Washington, D.C. area." *Id.* at 1. There is certainly no evidence, much less support in the Complaint, for the position that clients originated by Venable, Tominovich, and Fish are the only clients to which the Restrictive Covenant Defendants can render services in order to support themselves. To be sure, as long as Defendants do not work on non-Introduced Clients that they previously serviced at M&Q, they are free to compete and work anywhere and for any M&Q competitor.

Finally, the fact that Defendants' restrictions last two years and are nearly identical to one another does not render them unenforceable. Courts applying D.C. law have repeatedly held that two-year prohibitions are reasonable, and Defendants fail to cite a single case holding that restrictive covenant agreements are unenforceable solely because they are not uniquely tailored to or independently drafted for each individual employee. *See, e.g.*, *Deutsch v. Barsky*, 795 A.2d 669, 676–77 (D.C. 2002) ("We are satisfied that the two-year, five-mile radius restriction . . . is not facially invalid."); *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 621 (D.C. 1989) ("[T]he three year time duration of the restraining covenant was sufficiently reasonable so as not to preclude a finding of 'substantial likelihood of success on the merits.'").

Accordingly, for all these reasons, the Court should deny Defendants' Motion to Dismiss Count I of the Complaint.

**B.      The Complaint states a claim for breach of Defendant's confidentiality obligations.**

In addition to breaching the restrictive covenant in their employment agreements, Plaintiff's allegations (taken as true) also establish that Defendants breached their contractual confidentiality obligations. Defendants do not dispute the allegation that each of them agreed to the following confidentiality provision at the beginning of their employment with M&Q:

> So that the Firm may entrust you with full access to its confidential business information and the confidential business information of its clients without

> concern as to their disclosure or use other than for the benefit of the Firm, you
> agree that, during your employment with the Firm and for a period of five (5)
> years thereafter, you will keep confidential and not use, except for the benefit of
> the Firm, information received from clients of the Firm under a pledge of
> confidentiality or other information and documentation that is of value to the Firm
> or is not generally known to and might be of assistance to competitors of the
> Firm.

Compl. ¶ 176 & Exs. A–F; Mot. 23–24. Nor do Defendants dispute that this allegation reflects a

"valid contract between the parties" as well as an "obligation or duty arising out of the contract."

*Burnett*, 102 F. Supp. 3d at 192 (quotation omitted); Mot. 23–24. Instead, Defendants contend

that Plaintiff's contractual confidentiality claim "fails to meet the requisite pleading standard"

because "it is impossible to allege a violation of breach of contract to something that has not

occurred." Mot. 24.

As a preliminary matter, Defendants' focus on what has or has not actually "occurred"

ignores the very "pleading standard" they claim to invoke. Claimants need not *establish* facts at

the motion to dismiss stage, but rather *plead* them. *See Mahoney*, 2022 WL 523009, at *8

(resolving motion to dismiss based only on "the facts alleged in the complaint, any documents

either attached to or incorporated in the complaint, and matters of which courts may take judicial

notice" (quotation omitted)). Because courts "accept the plaintiff's factual allegations as true" at

this point and "do not assess the truth of what is asserted or determine whether a plaintiff has any

evidence to back up what is in the complaint," Defendants' demand for anything more than

allegations is inappropriate. *Browning*, 292 F.3d at 242 (quotation omitted).

Where Defendants do reference M&Q's allegations, moreover, they either misstate or

ignore the Complaint as written. For example, Defendants assert that Plaintiff fails to state a

claim because M&Q relies only "on what could *potentially* be a *future* breach." Mot. 23 (citing

Compl. ¶ 180). But M&Q expressly alleged more than just a "potential" or "future" breach of

9

confidentiality; a mere two paragraphs above the paragraph cited by Defendants, the Complaint states that "Defendants secretly *took* and, upon information and belief, *have impermissibly used*" the Firm's protected confidential information. Compl. ¶ 178 (emphasis added); *see also id.* ¶ 179 (alleging that sensitive information "was misappropriated").[2]

Defendants relatedly claim—with zero citations to the Complaint or any legal authority—that "M&Q does not allege any facts suggesting that Defendants have disclosed" or used confidential information. Mot. 24. But the Complaint alleges in detail that (1) Defendants accessed, downloaded, copied, and sent to their personal email addresses "thousands of pages of M&Q's confidential and trade secret information" as little as three days before their coordinated January 3 departures, Compl. ¶¶ 3, 134–51; and (2) Defendants began working for a competitor that "provides services to its clients that are the same as or substantially similar to the services provided by M&Q" almost immediately thereafter. Compl. ¶¶ 115–18. As this Court recognized at the preliminary injunction hearing, it is "natural to infer" that employees who engage in this behavior are "taking the stuff that they think is going to help them" (and which they will therefore use) "in their next place of employment." Dkt. 24, at 70:8–14. This "natural inference" is more than enough to survive a motion to dismiss. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 285 (D.D.C. 2017) (Jackson, J.) ("[A]t this stage of the litigation, the court must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in *plaintiffs'* favor." (quotation omitted)); *Hosp. Staffing Sols., LLC v. Reyes*,

---

[2] Even if M&Q had relied on the potential for future breach alone, that would also state a claim. *See Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 194, 201 (D.D.C. 2010) (granting injunction to prevent "future violations" of former employee's contractual confidentiality obligations); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271–72 (7th Cir. 1995) (upholding claim for breach of confidentiality agreement based on "threat" of misappropriation and future use/disclosure).

736 F. Supp. 2d 192, 200 (D.D.C. 2010) (holding that the "circumstances" of a former employee's departure and new employment "suggest that [he] has shared [confidential] information with competitors" based on a declaration indicating that the employee "had access to [plaintiff's] confidential and proprietary information" and an allegation in the complaint that the employee was "using and disclosing" that information). Defendants' Motion to dismiss Count II therefore fails.

## II.    M&Q plausibly alleged misappropriation of trade secrets.

M&Q alleges in Counts III and IV of its Complaint that Defendants misappropriated its trade secrets in violation of the federal DTSA and the local DCUTSA. Compl. ¶¶ 182–98. M&Q can state a claim under both statutes by plausibly alleging "(1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose." *Meyer Grp., Ltd. v. Rayborn*, No. 19-1945 (ABJ), 2020 WL 5763631, at *4 (D.D.C. Sept. 28, 2020) (quotation omitted). "Under both the federal and D.C. laws, a 'trade secret' is defined as information that 'derives independent economic value . . . from not being generally known' when 'the owner . . . has taken reasonable measures to keep such information secret.'" *Id.* (alterations in original) (first quoting 18 U.S.C. § 1839(3); then citing D.C. Code § 36-401(4)). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); D.C. Code § 36-401(1).

Despite more than 100 paragraphs of allegations in M&Q's complaint addressing the misappropriation of trade secrets, Defendants insist that M&Q should have said more. *But see* Fed. R. Civ. P. 8(a)(2) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Wells*, 17 F. Supp. 3d at 28 (explaining that the Rule 8 standard exists simply to "ensure[] that defendants receive fair notice of the claim being asserted so that

11

they can prepare a responsive answer"). Defendants offer three cursory arguments to support their position, each of which fails.

First, Defendants submit that "none" of the trade secret information alleged in the Complaint "is valuable based on its secrecy." Mot. 20. Given the breadth of this contention, and given the detail with which M&Q described and categorized its trade secrets, Compl. ¶¶ 18–35, one might expect that Defendants would parse through Plaintiff's trade secret allegations individually. But Defendants' Motion contains no careful analysis of that sort. Instead, Defendants provide a single case citation involving "customer lists," Mot. 20–21 (citing *Ruesch v. Ruesch Int'l Monetary Servs., Inc.*, 479 A.2d 295, 298 (D.C. 1984)), a premature factual assertion that "many of M&Q's client information [sic] is statutorily public information," *id.* at 21, and an observation that "M&Q's grant proposals are subject to FOIA requests," *id.* These arguments grossly oversimplify the extent and type of sensitive information that M&Q protects as trade secrets. *See, e.g.*, Compl. ¶¶ 19, 26–29, 31 (identifying "client training documents," "processes and methodologies for grant proposals," "information about M&Q's grant consultant network," "sensitive financial data," and "contracts, scopes of work, and project summaries associated with M&Q's clients" that took M&Q "significant time and economic resources" to develop and compile). Defendants' arguments come nowhere close to establishing that the trade secrets M&Q alleges purportedly are "easily ascertainable by the public or generally known within an industry." *Cf. Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 233 (D.D.C. 2016) (quotation omitted) (dismissing trade secret claim based on client information when complaint contained no "supporting details" and plaintiff "routinely disclose[d] its clients' identities and its formulas and methods in the course of its work assisting clients in litigation"). And the arguments ignore the principle that even "publicly available" information "may qualify

as a trade secret" when combined in ways that "add[] value." *Catalyst & Chem. Servs., Inc. v. Glob. Grounds Support*, 350 F. Supp. 2d 1, 10 (D.D.C. 2004) (emphasis omitted) (quotation omitted); *see also* Dkt. 24, at 82:14–20 (Court's recognition at preliminary injunction hearing that "McAllister & Quinn adds value to their clients" by "accreting knowledge").

Second, Defendants contend that M&Q insufficiently alleged the acquisition of trade secrets through "improper means" because Defendants performed their mass downloading and copying of protected information "while . . . still employed by M&Q." Mot. 21. But Defendants fail to provide a single citation for the proposition that employees always act appropriately when they access protected information while still employed. *Cf. HIRECounsel D.C., LLC v. Connolly*, No. 20-3337 (EGS), 2021 WL 5998365, at *6 (D.D.C. Dec. 20, 2021) (noting "improper means" has been broadly defined to include any "means that 'fall below the generally accepted standards of commercial morality and reasonable conduct'" (quoting *E.I. DuPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th Cir. 1970))). In fact, another judge on the Court held less than four months ago that a trade secret plaintiff sufficiently pleaded improper means and misappropriation on facts functionally identical to those alleged here. *Compare id.* (denying motion to dismiss where plaintiff alleged that former employee copied confidential information on the job and "emailed the information to his personal email address 10 days before he resigned from his position . . . and soon thereafter began working with one of [plaintiff's] direct competitors"), *with* Compl. ¶¶ 3, 134–51 (alleging that "in the weeks leading up to Defendants' departures" to a competing firm, "Defendants accessed and downloaded thousands of pages of M&Q's confidential and trade secret information" and sent some of that information to personal email addresses). This Court made a similar observation about impropriety at the parties' preliminary injunction hearing. *See* Dkt. 24, at 69:24–70:5 (finding "no doubt" that defendants

13

"accessed records and perhaps copied them" prior to their departure and "no doubt that they shouldn't have done that"). And under the plain language of the DTSA and the DCUTSA, Plaintiff's allegations that Defendants "breach[ed] . . . a duty to maintain secrecy" further confirm Defendants acted via "improper means." 18 U.S.C. § 1839(6)(A); D.C. Code § 36-401(1); *see supra* at 11-13. While Defendants suggest without citation that they accessed the alleged materials—and forwarded them to personal e-mail accounts—solely "to perform their job duties for M&Q" and "for a legitimate reason," Mot. 21, 23, that factual argument must wait for summary judgment or trial. *See Zimmerman*, 246 F. Supp. 3d at 271–72 (holding courts deciding a 12(b)(6) motion must "grant plaintiff the benefit of all inferences that can be derived from the facts alleged" (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000))).

Third, Defendants protest that M&Q failed to plead "use or disclosure" of its trade secrets. Mot. 22–23. As a preliminary matter, Defendants ignore that use or disclosure is not necessary when the tortfeasor acquired a trade secret through improper means. *See Meyer*, 2020 WL 5763631, at *4, *6 (defining "misappropriation" as "acquisition of the trade secret by improper means, *or* improper use or disclosure by one under a duty not to disclose" (emphasis added)); *accord* 18 U.S.C. § 1839(5); D.C. Code § 36-401(2). Again, Defendants' "breach or inducement of a breach of a duty to maintain secrecy" constitutes "improper means." *See* D.C. Code § 36-401(1). Therefore, since M&Q sufficiently alleged improper acquisition in this case, *see supra* at 12-13, it need not allege use or disclosure.

But M&Q *did* allege use and disclosure in any event, and Defendants' contrary arguments fail once again. Defendants begin by focusing on M&Q's allegations of threatened disclosure, allegations that they claim trigger a heightened standard of "inevitability." Mot. 22.

Nevertheless, Defendants admit that this Court "has yet to" adopt such a standard. *Id.* And even

if inevitability were the requirement, Defendants' "lack of candor" alleged in the Complaint

coupled with their "place[ment] in a comparable position with a direct competitor" would be

sufficient. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269–71 (7th Cir. 1995) (upholding

district court's grant of preliminary injunction under inevitable disclosure theory based on

inference that defendants' "lack of candor" suggested a "willingness to . . . misuse trade

secrets"); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504–05 (5th Cir. 1982) (finding threat of

irreparable injury sufficiently acute to reverse denial of preliminary injunction where plaintiff

"ha[d] trade secrets," defendant "ha[d] knowledge of at least some of those secrets," and

defendant "ha[d] been placed in a comparable position with a direct competitor without

restriction against using or disclosing [plaintiff's] trade secrets"); Compl. ¶¶ 92–98, 134–51

(alleging lack of candor in form of concealing client termination letters in violation of company

policy, mass downloading and copying of sensitive documents shortly before departures, and

violating confidentiality agreements); *id.* ¶¶ 115–18 (alleging Defendants left M&Q for

comparable positions with a competitor offering "the same . . . or substantially similar" services

to M&Q.

Defendants also ignore other key portions of Plaintiff's Complaint. For example, their

threatened disclosure argument completely overlooks allegations that Defendants "are *using*

M&Q's trade secrets and confidential information in their new positions at Thorn Run," not just

threatening to use this information. Compl. ¶¶ 188–89, 196–97 (emphasis added); *see also supra*

at 10-11 (explaining how Plaintiff's allegations create a natural inference that Defendants have

disclosed and are using M&Q's protected information while working for Thorn Run); Dkt. 20, at

16 (Plaintiff's reply in support of preliminary injunction explaining how "Defendants implicitly

concede that they possess, have used, and will continue to use information related to their 'Introduced Clients'"). Defendants further claim that "M&Q has failed to plead that the Defendants are in possession of any trade secrets whatsoever." Mot. 22. But this unsupported assertion squarely contradicts multiple portions of the Complaint too. *See* Compl. ¶¶ 138–48 (alleging Venable, Tominovich, Fish, Parduhn, Lee, and Newell each "maintain[ed] copies" of trade secret materials "following [their] separation from M&Q"); *id.* ¶ 149 ("Defendants remain in possession of M&Q's confidential and trade secret information in breach of their employment agreements.").

Finally, Defendants repeat their contention (once again backed by no legal authority at all) that downloading confidential materials "during . . . employment" is "not relevant to misappropriation." Mot. 23. This argument fails for the reasons articulated above. *See supra* at 13-14; *see also Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 26 (D.D.C. 2019) (recognizing that "a terminated employee has 'a [continuing] duty to the principal not to use or to disclose to third persons . . . trade secrets . . . or other similar confidential matters given to him" during employment for the employer's benefit (first and second alterations in original) (quoting Restatement (Second) of Agency § 396(b) (1958))); *Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32, 40 (D.D.C. 2009) (referencing employee's "post-termination obligation to maintain the confidentiality of the trade secrets he learned *while employed*" (emphasis added)); *Intertek Testing Servs., N.A. v. Pennisi*, 443 F. Supp. 3d 303, 341–42 (E.D.N.Y. 2020) (granting preliminary injunction on trade secret claim and holding that "an employee has an implied duty not to use confidential knowledge acquired *in his employment* in competition with his principal, which exists as well after the employment is terminated as during its continuance" (emphasis added) (quotation omitted)).

III.   **M&Q plausibly alleged attorney's fees and litigation expenses for Defendants' trade secret violations.**

Both the DTSA and the DCUTSA authorize the recovery of attorney's fees when a defendant "willfully and maliciously misappropriate[s]" a trade secret. 18 U.S.C. § 1836(b)(3)(D); D.C. Code § 36-404(3). Although M&Q specifically requested attorney's fees under these statutes and specifically alleged willful and malicious misappropriation, *see* Compl. ¶¶ 222–23 (Count IX), Defendants asks for dismissal on grounds that M&Q "has not successfully alleged that Defendants acted with either knowledge of probable consequences[] or intent to cause harm." Mot. 12. This argument fails for two independent reasons.

First, any obligation to plead attorney's fees derives solely from Federal Rule of Civil Procedure 9(g), which requires only that claimants "specifically state[]" the "special damage" item they want to request. *See* 5A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1310 (4th ed. 2021) [hereinafter Wright & Miller] (noting that some courts "have treated attorney's fees as items of special damage" that require pleading under Rule 9(g), while others have not). It is unclear whether this Court or the D.C. Circuit have taken a position on the applicability of Rule 9(g)'s pleading requirement to attorney's fees. If the Rule does not apply, M&Q can file a motion for attorney's fees under Rule 54(d)(2) at the conclusion of the case without saying anything about fees in the Complaint. *See Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1004–06 (9th Cir. 2009). But even if Rule 9(g) does apply, M&Q's allegations satisfy it because "they are definite enough to notify the opposing party and the court of the nature of the damages and enable the preparation of a responsive pleading." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019) (quoting Wright & Miller § 1311). By specifically requesting attorney's fees and linking that request to specific provisions in the DTSA and the DCUTSA, the Complaint ensures that Defendants will not "be[]

surprised . . . by the extent and character of [M&Q's] claim." Wright & Miller § 1310; *see*

*United Indus., Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762, 764–65 (5th Cir. 1996) (explaining that

plaintiff can "put its adversaries on notice that attorneys' fees are at issue" and thereby satisfy

Rule 9(g) simply "by specifically pleading for attorneys' fees in the complaint").

Second, M&Q has sufficiently pleaded Defendants' willful and malicious

misappropriation of trade secrets.[3] Assuming *arguendo* that Defendants correctly interpret

"willful" as "done with actual or constructive knowledge of [the] probable consequences" and

"malicious" as "done with intent to cause injury," Mot. 12, the Complaint's allegations meet

both of those definitions. *See* Compl. ¶¶ 1–4, 134–51 (alleging Defendants accessed, copied,

forwarded to personal e-mail addresses, and retained M&Q's trade secrets with the knowledge

and intent that they would use this information while working for a competitor to the detriment

of M&Q).

## IV.   M&Q plausibly alleged breach of fiduciary duty.

In addition to Defendants' contractual and statutory violations, M&Q also alleged that

Defendants committed fiduciary violations. Compl. ¶¶ 203–13 (Count VI). M&Q can state a

claim for breach of fiduciary duty under District of Columbia law by "alleg[ing] facts sufficient

to show (1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the

fiduciary relationship; and (3) injuries that were proximately caused by the breach of the

fiduciary duties." *Kemp v. Eiland*, 139 F. Supp. 3d 329, 343 (D.D.C. 2015). Defendants do not

(and could not) challenge the existence of a fiduciary relationship with M&Q as their employer.

*See Phillips v. Mabus*, 894 F. Supp. 2d 71, 92 (D.D.C. 2012) ("Employees, particularly managers

---

[3] Once again, Defendants incorrectly suggest that M&Q must rely on more than just its allegations to survive a motion to dismiss. *See* Mot. 12 (claiming "M&Q has not *conclusively established* anything related to Defendants' actions that would infer liability" (emphasis added)); *supra* at 9-10.

and officers, owe an undivided and unselfish loyalty to the corporation during the term of their employment, such that there shall be no conflict between duty and self-interest." (quotation omitted)). And the arguments Defendants do raise all fail.

First, Defendants seek to sidestep their fiduciary obligations by claiming the DCUTSA preempts them. Mot. 7–8; *see* D.C. Code § 36-407(a) (DCUTSA "supersedes conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation of a trade secret"). But nowhere do Defendants contend that M&Q brought its fiduciary duty claims entirely "under a misappropriation theory." Mot. 7. To the contrary, Defendants acknowledge in their Motion that M&Q sued each of them for "encouraging clients to obtain termination letters which they did not immediately disclose to M&Q," and also sued Venable, Fish, and Tominovich for "soliciting Lee, Newell, and Parduhn to resign from their employment." *Id.* at 8. Because these allegations are not "predicated on the misappropriation of trade secrets," *id.* at 7, they do not qualify for preemption under Defendants' own terms.

Second, Defendants attempt to justify their recruitment of clients away from the Firm, their solicitation of fellow employees, and their concealment of client termination letters by invoking the principle that "[a]n agent may make arrangements or plans to go into competition with his principal before terminating his agency." *Id.* at 8 (quoting *Phillips*, 894 F. Supp. 2d at 93). Skip just a few words down the page, however, and Defendants' own authority undermines their argument. The *Phillips* case immediately qualifies an agent's ability to plan his future competition by emphasizing that "he may only do so 'provided no unfair acts are committed or injury done [to] his principal.'" 894 F. Supp. 2d at 93 (alteration in original) (quoting *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996)). Then, *Phillips* specifically notes that "in preparing to compete, an employee may not engage in 'misuse of confidential

information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees.'" *Id.* (quoting *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 54 (D.D.C. 2001)). M&Q alleged that Defendants did all of the above—a paradigmatic display of "unfair," "injurious," and anti-fiduciary behavior. *See* Compl. ¶¶ 1–4, 115–18, 134–51 (alleging improper access and retention of confidential information in preparation to begin working for a competitor); *id.* ¶¶ 2, 92–99 (alleging "Defendants solicited then-clients of M&Q to terminate their contracts with M&Q and to follow Defendants to M&Q's competitor"); *id.* ¶¶ 1, 109, 112, 200, 210 (alleging that "Venable, Tominovich, and Fish solicited Lee, Newell, and Parduhn to resign from their employment at M&Q" in a coordinated and "mass resignation" of "nearly one-tenth of M&Q's workforce"). Not to mention the other unfair and deceptive acts described in the Complaint, including Fish's and Tominovich's decision to "withhold[] client termination letters from M&Q's knowledge" in "a departure from Firm practice and also from their own historical practices." *Id.* ¶ 99.

Third, Defendants raise a smattering of other arguments to excuse their illicit conduct. They claim that they did not "use[] confidential information when obtaining termination letters." Mot. 8–9. But that does not change the fact that Defendants "prepar[ed] to compete" by misappropriating confidential information more generally, nor does it justify their other unfair behaviors. *Phillips*, 894 F. Supp. 2d at 93. Defendants claim that M&Q "does not plead . . . a non-solicitation clause" prohibiting one employee from recruiting another. Mot. 9. But Defendants' principal case *rejected* an argument that a "binding non-compete contract" was required to state a claim for breach of fiduciary duty. *Phillips*, 894 F. Supp. 2d at 94–95 (holding "Plaintiffs have clearly stated a claim for breach of fiduciary duty" after "assuming *arguendo* that plaintiffs had no enforceable non-compete agreement with the employees"). And they claim

20

that the Introduced Client carve-out prevents M&Q from alleging an injury. Mot. 9, 11. But

Defendants' interpretation of that provision defies its plain text, *see supra* at 6-7, and the fact that

Tominovich, Fish, and Venable could have left the Firm with the clients they "solely introduced"

does not erase the harm they inflicted by deceptively competing for clients during their

employment. *See* Compl. ¶¶ 207–09, 212–13 (alleging that "M&Q has been damaged and

continues to be damaged" because Defendants actively "encouraged clients to terminate their

contractual relationships with M&Q" and failed to "disclose competitive activity"). Nor does the

Introduced Client carve-out alter the reality that Defendants combined to deprive M&Q of

"nearly one-tenth of [its] workforce" within a 37-minute period. *Id.* ¶¶ 2, 210. Defendants'

objections thus miss the mark, and Plaintiff's claim for breach of fiduciary duty should proceed.[4]

## V.    M&Q plausibly alleged tortious interference.

M&Q alleges in Count VIII of its Complaint that Defendants Venable, Tominovich, and

Fish tortiously interfered with the employment agreements between M&Q and Defendants Lee,

Newell, and Parduhn. Compl. ¶¶ 214–21. Specifically, M&Q alleges that supervisors Venable,

Tominovich, and Fish induced supervisees Lee, Newell, and Parduhn to violate their restrictive

covenants by leaving the Firm and working for M&Q clients that the supervisees did not "solely

introduce." *Id.* To state a claim for tortious interference with contract, a plaintiff "must allege (1)

the existence of a contract between the plaintiff and a third party; (2) knowledge of the contract

by the defendant; (3) intentional procurement by the defendant of a breach of contract; and (4)

damages resulting from the breach." *Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 65 (D.D.C. 2006).

Defendants' preliminary argument is that Lee, Newell, and Parduhn never breached any

contract because the restrictive covenant they signed permits them to work for a supervisor's

---

[4] Defendants raise other objections to M&Q's theory of trade secret misappropriation, Mot. 9–11, all of which fail for the reasons explained above, *see supra* at 11-16.

Introduced Clients. Mot. 13–14. As already explained, this argument ignores the unambiguous text of Defendants' employment agreements. *See supra* at 6-7. The agreements plainly prohibit Defendants for a post-employment period of two years from working with any M&Q client other than Introduced Clients, which are expressly defined as "those clients that *you solely* originate based on *your* work, experience, or personal relationships."  Compl. ¶ 162 (emphasis added). Thus, because Introduced Clients do not include M&Q clients that other people (*i.e.*, not "you") originated, the carve-out clearly prohibits Lee, Newell, and Parduhn from working with Venable's, Fish's, and Tominovich's Introduced Clients.  Not only is that what is "contemplated" by the agreements, but that is how M&Q expressly and plainly drafted the limited exception to the post-termination restrictive covenant. Mot. 14.

Unable to contest "breach," Defendants shift gears to contend that M&Q has not sufficiently pleaded the "knowledge" and "damages" elements of its tortious interference claim. *Id.* These arguments either miss or ignore significant portions of Plaintiff's Complaint.

Starting with knowledge, not only has M&Q expressly alleged that Venable, Tominovich, and Fish were aware of Lee's, Newell's, and Parduhn's employment agreements, Compl. ¶ 216, but M&Q also asserted numerous facts to demonstrate and support these allegations. M&Q pleaded that Venable's, Tominovich's, and Fish's employment agreements each contained identical or nearly identical post-employment restrictions as those contained in Lee's, Newell's, and Parduhn's agreements. *Id.* ¶¶ 65, 67, 218; *compare also id.* Exs. A–C *with id.* Exs. D–F. M&Q also pleaded that Lee, Newell, and Parduhn reported directly to Tominovich and Fish and that Venable, Tominovich, and Fish were high-level leaders at the Firm. *See* Compl. ¶¶ 44, 55– 57.  Moreover, M&Q asserted facts showing that Tominovich and Fish had reviewed their employment agreements before sending synchronized termination e-mails in which they both

referred explicitly to their "Introduced Clients." *Id.* ¶¶ 92, 95. Collectively, these facts support M&Q's allegation that Venable, Tominovich, and Fish were aware of the employment agreements of their subordinates Lee, Newell, and Parduhn. *See id.* ¶ 216.

Turning to damages, M&Q adequately pleaded that it suffered "damages . . . in an amount to be proven at trial." *Id.* ¶ 221. Defendants' assertion that M&Q's damages are speculative is both inaccurate and not a basis for dismissal at this state of the litigation. *See Alemayehu v. Abere*, 199 F. Supp. 3d 74, 86 (D.D.C. 2016) ("At this juncture, Mr. Alemayehu is not required to make a precise damages calculation."); *see also NCB Mgmt. Servs., Inc. v. FDIC*, 843 F. Supp. 2d 62, 70 (D.D.C. 2012) ("At [the pleadings] stage," in a breach of contract claim, a plaintiff "need not plead with particularity damages that would typically be expected to flow from its claims."). Moreover, M&Q alleged that Venable, Tominovich, and Fish intentionally procured breaches of Lee's, Newell's, and Parduhn's employment agreements. Compl. ¶ 220. This tortious interference with the employment agreements resulted in three revenue-generating employees leaving M&Q's employ. *Id.* ¶¶ 1–2. M&Q also pleaded that Lee, Newell, and Parduhn serviced Tominovich's and Fish's Introduced Clients at M&Q, that these clients subsequently left M&Q to follow Defendants to Thorn Run, and that Lee, Newell, and Parduhn continue to service those clients there. *See id.* ¶¶ 55, 56, 92–97, 118, 125, 126, 128, 129, 131, 132, 165-167. Although these clients are the Introduced Clients of Tominovich and Fish, nothing prohibited these Introduced Clients from keeping their work at M&Q. They did not have to follow Tominovich and Fish and in fact may not have gone to Thorn Run but for Lee, Newell, and Parduhn also going. Plaintiff is entitled to conduct discovery to determine whether Tominovich's and Fish's Introduced Clients would have left M&Q but for Lee, Newell, and Parduhn, and if not, the extent of damages it has suffered from losing these clients as a direct and

proximate result of Venable's, Tominovich's, and Fish's tortious interference with Lee's, Newell's, and Parduhn's agreements.

Finally, Defendants argue that Plaintiff has failed to state a claim because "the Complaint does not allege any egregious conduct on behalf of the Defendants, such as libel, slander, or fraud." Mot. 14. However, M&Q does not have to plead egregious conduct. The D.C. Circuit has previously held that under D.C. law, a plaintiff "need not allege inducement through egregious means, such as libel, slander, coercion, or disparagement" for a tortious interference claim. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134, 1136 (D.C. Cir. 2015). "[I]nducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other." *Id.* (alteration in original) (quoting Restatement § 766 cmt. k). Plaintiff has alleged numerous facts to demonstrate that Venable, Tominovich, and/or Fish induced Lee, Newell, and Parduhn to breach their post-employment restrictions with M&Q. Plaintiff expressly alleged that (1) Lee, Newell, and Parduhn reported to Tominovich or Fish, Compl. ¶¶ 55, 56; (2) Tominovich and Fish solicited Lee, Newell, and Parduhn to quit M&Q, *id.* ¶¶ 109, 112; (3) all six Defendants coordinated their resignations and resigned within 37 minutes of each other with Tominovich and Fish leading the charge, *id.* ¶¶ 1, 92, 95, 108, 110, 111; and (4) Lee, Newell, and Parduhn are currently providing services to Tominovich's and Fish's Introduced Clients on behalf of Thorn Run, *id.* ¶¶ 125, 126, 128, 129, 131, 132. Taken together, these allegations plausibly demonstrate that Venable, Tominovich, and/or Fish influenced and induced Lee, Newell, and Parduhn to quit M&Q and work at Thorn Run for clients covered by the restrictive covenants in express breach of their employment agreements.

In sum, Plaintiff clearly and more than adequately pleaded a tortious interference claim to withstand a motion to dismiss, and Defendants' cases provide no support for their argument to

the contrary. In *Robert Half Int'l Inc. v. Billingham*, this Court *denied* defendant's motion to dismiss a tortious interference claim. *See* 317 F. Supp. 3d 379, 383–84 (D.D.C. 2018). Defendants' reliance on *Government Relations Inc. v. Howe* is similarly misplaced. Mot. 20. There, the Court dismissed plaintiff's tortious interference claim where plaintiff "merely speculate[d] that [it] suffered 'serious damages, loss of clients, loss of reputation, and loss of confidential information." *Gov't Rels Inc. v. Howe,* No. Civ.A. 05-1081 CKK, 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007). But here, M&Q does not merely *speculate* that it suffered damages. Compl. ¶ 221. Rather, M&Q specifically alleges that it *has* suffered damages but that *the amount* must be determined at trial. *Id.* And M&Q has alleged plenty of facts demonstrating how it was injured. *See supra* at 23. As previously discussed, these allegations meet the notice pleading standard on a motion to dismiss. *See Alemayehu*, 199 F. Supp. 3d at 86; *NCB Mgmt. Servs.*, 843 F. Supp. 2d at 70. In short, because neither the facts nor the law support Defendants' argument, the Court should summarily deny Defendant's Motion to Dismiss Count VIII of the Complaint.

**VI.    M&Q plausibly alleged civil conspiracy.**

D.C. law permits a plaintiff to state a claim for civil conspiracy by alleging "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 124 (D.D.C. 2018) (quotation omitted). While Defendants argue the DCUTSA preempts civil conspiracy claims "based on misappropriation" of trade secrets, Defendants identify no conspiracy case from this Court or the District of Columbia specifically holding as much. Mot. 4–6. Their Motion also ignores M&Q's allegations that Defendants agreed to and did commit multiple "unlawful acts" separate and independent from the trade secret violations. *See* Compl. ¶¶ 1, 105–07, 109, 112,

114, 199, 210 (alleging "coordinated" competition and departure of all Defendants in violation of their contractual obligations and fiduciary duties as evidenced by, *inter alia*, (1) overlapping solicitation of fellow employees, (2) "substantially identical notices of resignation," (3) a resignation template authored by Tominovich, and (4) delivery of resignation letters within a 37-minute window). As with its other claims, M&Q successfully states a claim for civil conspiracy.

## **CONCLUSION**

For the foregoing reasons, M&Q respectfully requests that the Court deny Defendants' Motion to Dismiss and permit M&Q's well-pleaded claims to move forward.

Respectfully submitted, this 13th day of April, 2022.

<div style="margin-left:40%">

/s/ Joel D. Bush, II
Joel D. Bush, II
(*admitted pro hac vice*)
jbush@kilpatricktownsend.com
Kathleen B. Dodd Barton
(*admitted pro hac vice*)
kbarton@kilpatricktownsend.com
**KILPATRICK TOWNSEND &**
    **STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

Alexander M. Bullock
D.C. Bar No. 446168
abullock@kilpatricktownsend.com
**KILPATRICK TOWNSEND &**
    **STOCKTON LLP**
607 14th Street, NW
Suite 900
Washington, DC  20005
Telephone:  (202) 508-5831
Facsimile:  (202) 585-0057

*Counsel for Plaintiff McAllister & Quinn,*
*LLC*

</div>

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have this day electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to all counsel of record.

DATED:  April 13, 2022.                                    /s/ Joel D. Bush, II
                                                                         Joel D. Bush, II
                                                                         Admitted *Pro Hac Vice*

                                                                         *Counsel for Plaintiff McAllister & Quinn, LLC*